**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| CARL A. DISSETTE, *et al.*, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | Case No. 1:16-cv-11389 |
| v. ) | |
| ) | Hon. Thomas M. Durkin |
| PIE FIVE PIZZA COMPANY, INC. *et al.*, ) | |
| ) | |
| Defendants. ) | |
| ) | |
| PIE FIVE PIZZA COMPANY, ) | |
| ) | |
| Counter-Claimant, ) | |
| ) | |
| v. ) | |
| ) | |
| B & C RESOURCES, INC., MBT-FIVE, INC., ) | |
| and CARL A. DISSETTE, ) | |
| ) | |
| Counter-Defendants. ) | |

**DEFENDANTS' ANSWER, AFFIRMATIVE
DEFENSES, AND COUNTERCLAIMS**

Pursuant to Rule 12 of the Federal Rules of Civil Procedure, Defendants Pie Five Pizza Company, Inc. ("Pie Five") and Rave Restaurant Group, Inc. ("Rave") (collectively, "Defendants") respond to Plaintiffs' Complaint (Dkt. 1), as follows:

**PARTIES**

1.     Plaintiff CARL A. DISSETTE ("Dissette") is a citizen and resident of Michigan. He is an experienced quick service restaurant franchisee. Through the companies named as co-plaintiffs, he owns seven Pie Five pizza restaurants as a franchisee or intended franchisee of Defendant Pie Five Pizza Company, Inc.

**ANSWER:** Defendants admit that Dissette is an experienced quick service restaurant franchisee, that certain companies identified as co-plaintiffs have entered into franchise agreements with Pie Five, and that Dissette is a resident of Michigan. Defendants deny the remaining allegations contained in Paragraph 1 of the Complaint.

2. Plaintiff B & C RESOURCES, INC. is an Illinois "S" Corporation with its principal place of business at 3041 N Lincoln Ave, #1R, Chicago IL 60657. Dissette is the sole shareholder and the president of this corporation. This corporate plaintiff is a franchisee of Defendant Pie Five Pizza Company, Inc.

**ANSWER:** Defendants admit the allegations contained in Paragraph 2 of the Complaint.

3. Plaintiff MBT FIVE, INC. is an Indiana "S" Corporation with its principal place of business at 3041 N Lincoln Ave, #1R, Chicago IL 60657. Dissette is the sole shareholder and the president of this corporation. This corporate plaintiff is a franchisee of Defendant Pie Five Pizza Company, Inc.

**ANSWER:** Defendants admit the allegations contained in Paragraph 3 of the Complaint.

4. Plaintiff MBT-FIVE IOWA, INC. is an Iowa "S" Corporation with its principal place of business at 3041 N Lincoln Ave, #1R, Chicago IL 60657. Dissette is the sole shareholder and the president of this corporation. This corporate plaintiff is a franchisee of Defendant Pie Five Pizza Company, Inc.

**ANSWER:** Defendants admit the allegations contained in Paragraph 4 of the Complaint.

5. Defendant PIE FIVE PIZZA COMPANY, INC. ("Pie Five") is a Texas

corporation incorporated on June 16, 20111 [sic], and with its principal place of business at 3551 Plano Parkway, The Colony, Texas 75056. This defendant is the franchisor of a fast casual restaurant brand known as "Pie Five" or "Pie Five Restaurants."

**ANSWER:** Defendants admit the allegations contained in Paragraph 5 of the Complaint except that Defendants deny the stated date of incorporation.

6. On information and belief, Defendant RANDALL E. GIER ("Gier") is an individual citizen and resident of the State of Texas. He was the president of Pie Five at the time of the facts giving rise to this complaint.

**ANSWER:** Defendants admit that Randall E. Gier was formerly president of Pie Five. Defendants admit on information and belief that Gier is a resident of the State of Texas. Defendants deny the remaining allegations contained in Paragraph 6 of the Complaint.

7. On information and belief, Defendant MARK H. RAMAGE ("Ramage"), is an individual citizen and resident of the State of Texas. He was the franchise sales manager of Pie Five at the time of the facts giving rise to this complaint.

**ANSWER:** Defendants admit that Mark Ramage was formerly Director of Franchise Sales of Pie Five. Defendants admit on information and belief that Ramage is a resident of the State of Texas. Defendants deny the remaining allegations contained in Paragraph 7 of the Complaint.

8. Defendant RAVE RESTAURANT GROUP, INC. ("RAVE") is a Missouri Corporation formerly known as Pizza Inn Holdings, Inc. and has its principal place of business at 3551 Plano Parkway, The Colony, Texas 75056, in the same offices or suite of offices as Defendant Pie Five, which is a wholly-owned subsidiary of RAVE.

3

**ANSWER:** Defendants admit the allegations contained in Paragraph 8 of the Complaint.

## JURISDICTION & VENUE

9.     This Court has diversity jurisdiction over this civil action under 28 U.S.C. § 1332 because the parties are citizens of different states and the amount in controversy exceeds the sum or value of $75,000, exclusive of interests and costs.

**ANSWER:**     Defendants admit that the Court has diversity jurisdiction over this action, but deny that there is any proper basis for the action and deny the remaining allegations contained in Paragraph 9 of the Complaint.

10.     All of the Defendants are subject to jurisdiction in Illinois because Pie Five offered and sold franchises in this state.  Personal jurisdiction is conferred by Section 4 of the Illinois Franchise Disclosure Act, 815 ILCS 705/4 and 815 ILCS 705/26. The Defendants are also subject to long arm jurisdiction in Illinois under 735 ILCS 5/209(a).

**ANSWER:**     Defendants deny the allegations contained in Paragraph 10 of the Complaint.

11.     Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to this complaint occurred in this judicial district.

**ANSWER:**     Defendants admit that venue is proper in this District, but deny that there is any proper basis for this action and deny the remaining allegations contained in Paragraph 11 of the Complaint.

## BACKGROUND

12.     In or about 1958, RAVE or its predecessor opened a pizza restaurant in Dallas,

Texas known as "Pizza Inn" and within a few years began selling franchises. By June 2016, RAVE owned and operated one Pizza Inn restaurant, and through a different subsidiary RAVE franchised 161 Pizza Inn restaurants in the United States and 60 Pizza Inn restaurants internationally.

**ANSWER:** Defendants admit the allegations contained in Paragraph 12 of the Complaint.

13.     In or prior to 2011, RAVE created a second retail pizza restaurant brand called "Pie Five" which has as its defining characteristic the promise to create and deliver a personal pizza for each customer within five minutes – hence the "Pie Five" name.

**ANSWER:** Defendants admit the allegations contained in Paragraph 13 of the Complaint.

14.     In June 2011, RAVE or its subsidiary opened the first Pie Five restaurant in Ft. Worth, Texas. In September 2011, Pie Five (a RAVE subsidiary) began offering Pie Five franchises, and in November 2012 Pie Five sold its first franchise development agreement. By June 2014 there were 7 franchised Pie Five Restaurants.

**ANSWER:** Defendants admit the allegations contained in Paragraph 14 of the Complaint.

15.     By the date of this complaint, Pie Five claims on its web page to have 97 locations open, in 24 states and Washington D.C., with over 450 franchise locations and 31 company markets under development. See http://franchise.piefivepizza.com/ (12/14/2016).

**ANSWER:** Defendants admit the allegations contained in Paragraph 15 of the Complaint.

16.     To obtain additional revenue, on a date unknown, RAVE created a division

known as Norco Restaurant Services Company ("Norco") to supply its company-owned and franchised restaurants (both Pie Five and Pizza Inn) with food, equipment and supplies. RAVE or its subsidiaries also contracted with third party distributors to supply food, equipment or supplies to its company-owned and franchised restaurants (both Pie Five and Pizza Inn), and these agreements frequently (if not always) require the third-party supplier to pay rebates or commissions to RAVE or its subsidiaries.

**ANSWER:**  Defendants admit that Norco is an unincorporated division of a RAVE subsidiary and that it provides certain supplies to Pie Five and Pizza Inn franchises.  Defendants also admit that RAVE or its subsidiary contract with **[a/certain]** third party distributor**[s]** to distribute necessary supplies to company-owned and franchised restaurants.  Defendants deny the remaining allegations contained in Paragraph 16 of the Complaint.

17.     In 1993, RAVE or its predecessor began trading its stock on the NASDAQ stock market and presently trades on the NASDAQ Capital Market under the ticker symbol "RAVE."

**ANSWER:**  Defendants admit the allegations contained in Paragraph 17 of the Complaint.

18.     In recent years RAVE's stock has been in sharp decline.

**ANSWER:**  Defendants deny the allegations contained in Paragraph 18 of the Complaint.  Defendants aver that RAVE's stock price increased in calendar year 2015.

19.     On information and belief RAVE's poor financial performance has motivated RAVE and its subsidiaries including Pie Five to perpetrate the fraudulent scheme against their franchisees alleged herein.

**ANSWER:**  Defendants deny the allegations contained in Paragraph 19 of the Complaint.

6

20.     As a franchisor (a seller of franchises), Pie Five was required by the Federal Trade Commission (FTC) "Franchise Rule" and certain state laws to provide Plaintiffs with disclosure documents known as a "Franchise Disclosure Document" (FDD) before selling franchises, or areas for franchise development to Plaintiffs or other franchisees or area developers.

**ANSWER:** Defendants admit that Paragraph 20 of the Complaint purports to summarize various legal and regulatory requirements.  Defendants aver that they have complied with all such requirements.  Defendants deny the remaining allegations contained in Paragraph 20 of the Complaint.

21.     Specifically, in 1978, the Federal Trade Commission (FTC), acting under the Federal Trade Commission Act, 15 U.S.C. §45, enacted a "Franchise Rule" at 16 CFR Part 436 et seq. to prevent deceptive and unfair practices in the sale of franchises. The FTC Franchise Rule is a pre-sale disclosure rule that requires specified disclosures through a disclosure document that must be provided to prospective franchisees prior to the offer or sale of a franchise. It requires franchisors to disclose material information to prospective franchisees to allow them, as informed investors to determine for themselves whether a particular franchise transaction is in their best interests. The North American Securities Administrators Association ("NASAA"), an association of state securities regulators, adopted its own set of requirements for pre-sale franchise disclosure, known as the "UFOC Guidelines."[1] The FTC accepts satisfaction of the UFOC Guidelines as compliance with the Franchise Rule.[2] Prior to the franchise sales in this case, the term "Uniform Franchise Offering Circular" or "UFOC" was changed to

---

[1] See Uniform Franchise Offering Circular—1993 Guidelines.

[2] See 60 Fed. Reg. 51,895 (Oct. 4, 1995).

"Franchise Disclosure Document" or "FDD" for short.

**ANSWER:** Defendants admit that Paragraph 21 of the Complaint purports to summarize various legal and regulatory requirements. Defendants aver that they have complied with all such requirements. Defendants deny the remaining allegations contained in Paragraph 21 of the Complaint.

22.     After Dissette expressed interest in the Pie Five franchise opportunity, Pie Five delivered these FDDs to Dissette:

> (a) An FDD dated March 17, 2014, delivered to Dissette in or about August 26, 2014.

> (b) An FDD dated October 27, 2014, delivered to Dissette in or about November 13, 2014.

> (c) An FDD dated October 26, 2015, delivered to Dissette in or about November 28, 2016.

**ANSWER:** Defendants admit the allegations contained in Paragraph 22 of the Complaint.

23.     On dates alleged below, the parties entered contracts by which Dissette and his operating companies acquired the rights to develop the Pie Five brand in Indiana and Iowa, and also to operate certain Pie Five restaurants in the Chicago market:

> (a) On or about September 18, 2014, MBT FIVE, INC., as area developer entered an area developer agreement with Pie Five (the "Indiana Area Developer Agreement").

> (b) On March 16, 2015, MBT FIVE, INC., as franchisee, entered a franchise agreement with Pie Five for a restaurant at 6704 Whitestown Parkway,

Zionsville, IN 46077 (the "Whitestown" agreement). The Whitestown restaurant authorized by this agreement opened for business on September 8, 2015.

(c) On April 20, 2015, MBT FIVE, INC., as franchisee, entered a franchise agreement with Pie Five for a restaurant at 48 E. Washington St., Indianapolis, IN 46204 (the "Washington Street" agreement). The Washington Street restaurant authorized by this agreement opened for business on July 22, 2015.

(d) On or about May 14, 2015, MBT FIVE IOWA, INC, as area developer entered an area developer agreement with Pie Five (the "Iowa Area Developer Agreement").

(e) On February 23, 2016, MBT FIVE IOWA, INC, as franchisee, entered a franchise agreement with Pie Five for a restaurant at 1315 SW. Oralabor, #101, Ankeny, IA, 50023 (the "Ankeny" agreement). The Ankeny restaurant authorized by this agreement opened for business on May 10, 2016.

(f) On February 23, 2016, MBT FIVE, INC., as franchisee entered a franchise agreement with Pie Five for a restaurant at 5129 N. Main Street, Mishawaka, IN 46545 (the "Mishawaka" agreement). The Mishawaka restaurant authorized by this agreement opened for business on December 6, 2016.

(g) On April 4, 2016, B & C RESOURCES, INC., purchased an established Pie Five restaurant at 1428 North Meacham Road, Schaumburg that Pie Five had opened, owned, and operated as a company-owned store; and became a franchisee for that restaurant. As part of this transaction, B & C RESOURCES, INC. became a sub-lessee of the restaurant premises, while Pie

Five remained the lessee.

    (h) On April 4, 2016, B & C RESOURCES, INC., as franchisee entered a franchise agreement with Pie Five for a restaurant at 1219 West Golf Road, Rolling Meadows, IL 60008 (the "Rolling Meadows." agreement). The Rolling Meadows restaurant authorized by this agreement opened for business on September 29, 2016.

**ANSWER:** Defendants admit the allegations contained in Paragraph 23 of the Complaint regarding the dates of entry of various franchise agreements and area development agreements as well as the opening date of the associated restaurants. Defendants refer to the terms of the specific agreements for their content and import. Defendants deny that B & C Resources was a "sub-lessee" and aver that the Schaumburg lease was assigned to B & C Resources by Pie Five Restaurants, Inc.. Defendants further aver that B & C failed to comply with its obligations under the lease. Defendants deny the remaining allegations contained in Paragraph 23 of the Complaint.

24.     Dissette guaranteed the franchisee's obligations under each of the above six franchise agreements and two area developer agreements.

**ANSWER:** Defendants admit the allegations contained in Paragraph 24 of the Complaint.

25.     In addition, the parties reached oral agreements for the opening of two additional Pie Five restaurants, but the franchise agreements for these restaurants have not been signed:

    (a) On November 3, 2016, MBT FIVE, INC. opened a restaurant at 5320 E. 82nd Street, #C, Indianapolis, IN 46204 (the "Castleton" restaurant) by verbal agreement with Pie Five.

(b) MBT FIVE IOWA, INC. begun the construction of a restaurant at 6305 Mills Civic Parkway, West Des Moines, IA 50266 to be opened in May 2017, (the West Des Moines" restaurant), by verbal agreement with Pie Five.

**ANSWER:** Defendants deny the allegations contained in Paragraph 25 of the Complaint. Defendants aver that Dissette has improperly failed and refused to return the tendered franchise agreement for the Castleton restaurant.

26. As a matter of law Plaintiffs had the right to rely on the FDDs from Five Pie being accurate, complete, truthful and not misleading.

**ANSWER:** Paragraph 26 of the Complaint contains legal assertions to which no response is required. To the extent that any response is deemed to be required, Defendants deny the allegations contained in Paragraph 26 of the Complaint. Defendants aver that the FDDs provided in fact were accurate, complete, truthful, and not misleading.

27. In entering each of their contracts with Pie Five, Plaintiffs did reasonably and justifiably rely on the FDDs from Five Pie being accurate, complete, truthful and not misleading.

**ANSWER:** Defendants deny the allegations contained in Paragraph 27 of the Complaint.

28. In connection with the contracts that Plaintiffs entered with Pie Five, Plaintiffs paid Pie Five various amounts as fees, made additional commitments to Pie Five and various third parties for real estate occupancy, and made additional expenditures to Pie Five, its affiliates and third parties for operating expenses, royalties and other expenditures. Plaintiffs' total expenditures for their Pie Five franchises and development opportunities exceed $3,500,000.00 by the date of this Complaint.

**ANSWER:** Defendants admit that certain corporate plaintiffs have made certain

11

payments of royalties and fees to Pie Five. Defendants are without knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 28 of the Complaint.

29.     Prior to making each of the franchise sales to Plaintiffs, RAVE and Pie Five knew, or recklessly disregarded the truth that:

(a) Its company owned Pie Five restaurants were losing money.

(b) Its corporate parent (RAVE) was in financial decline or distress, meaning it could not support the Pie Five franchise program and would instead become a drain on this franchise program.

(c) Pie Five did not have a "system" in place, as that term is used in the Pie Five franchise agreements that would likely lead to success when implemented or replicated by franchisees as franchised locations.

(d) Pie Five did not have store designs or systems in place that would enable franchisees to deliver the brand promise of delivering attractive pizza product to customers within five minutes.

(e) Pie Five did not have sufficient personnel to support its franchisees.

(f) Pie Five did not have vendor relationships in place to support success by its franchisees.

(g) Pie Five did not have marketing programs in place, or in planning, to support franchisee success particularly where franchisees or area developers would bring the brand to new markets.

(h) Its Franchise Disclosure Documents (FDDs) contained materially false, misleading or deceptive representations and omissions.

**ANSWER:** Defendants deny the allegations contained in Paragraph 29 of the Complaint.

30. Despite its knowledge or in reckless disregard of the facts alleged in paragraph 29, and beginning on a date unknown, Defendant Pie Five and its parent corporation, RAVE, embarked on a scheme to defraud prospective franchisees including but not limited to these Plaintiffs.

**ANSWER:** Defendants deny the allegations contained in Paragraph 30 of the Complaint.

31. In 2012, 2013, and into the summer of 2014, prior to any franchise sales to Dissette and his companies, RAVE and its subsidiary Pie Five were losing money on their operation of each company-owned Pie Five restaurant. RAVE disclosed these losses in its Form 10K filing with the Securities and Exchange Commission (SEC) for the year ended June 29, 2014 (copy available on SEC website, p. 21/67).

**ANSWER:** Defendants deny the allegations contained in Paragraph 31 of the Complaint. Defendants aver that, not only was the company not "losing money on [its] operations of each company-owned Pie Five restaurant" as alleged, but the 2014 RAVE 10-K actually shows positive restaurant operating cash flow for these restaurants in every quarter of fiscal years 2013 and 2014.

32. RAVE and its subsidiary Pie Five continued to lose money on their operation of each company-owned Pie Five restaurant in 2015 and 2016, as disclosed in RAVE's SEC Form 10K filing for the year ended June 26, 2016 (copy available on SEC website, p. 21/73). RAVE stated that the "decline in average weekly sales operating cash flow for Company-owned Pie Five restaurants was primarily attributable to lower sales and weaker performance by stores in

13

newer markets." *Id.*

**ANSWER:**    Defendants admit that Paragraph 32 of the Counterclaim accurately quotes a portion of one sentence of RAVE's 10-K for the year ended June 26, 2016.  Defendants refer to the entire 10-K for its content and import.  Defendants deny the remaining allegations contained in Paragraph 32 of the Complaint.

33.    In the same SEC filings, RAVE disclosed that from 2012 into 2016 it was losing money on its operations of company owned Pizza Inn restaurants.

**ANSWER:**    Defendants refer to the full SEC filing for its content and import. Defendants deny the remaining allegations contained in Paragraph 33 of the Complaint.

34.    At no point prior to any franchise sale to Dissette or his companies did RAVE or Pie Five disclose to Plaintiffs it was losing money in its operations of any or all of its company-owned Pie Five restaurants (and nor did it disclose the other facts alleged in paragraph 29). Instead, as alleged below, RAVE and Pie Five intentionally deceived Dissette into believing these restaurants were profitable.

**ANSWER:**    Defendants deny the allegations contained in Paragraph 34 of the Complaint.

35.    Among the disclosures regulated by the FTC Franchise Rule, Item 19 entitled "*Financial Performance Representations*" permits (but does not require) a franchisor to provide information about the actual or potential financial performance of its franchised and/or franchisor-owned outlets, if there is a reasonable basis for the information, and if the information is included in the disclosure document." (See 16 CFR §436.5(s)).

**ANSWER:**    Defendants admit that Paragraph 35 of the Complaint purports to summarize various legal and regulatory requirements.  Defendants aver that they have complied

14

with all such requirements. Defendants deny the remaining allegations contained in Paragraph 35 of the Complaint.

36.     In Item 19 of each of the FDDs that Pie Five gave to Plaintiffs, Pie Five elected to make financial performance representations. Disclosures were made only for selected company-owned restaurants and not for any of the franchises it had sold. These disclosures were:

(a)  In the FDD issued October 28, 2013 and amended March 17, 2014:

(i)     Average Weekly Gross Sales for restaurants open 53 weeks: $13,188.

(ii)    Average Weekly Gross Sales for restaurants open less than 53 weeks: $15,960.

(iii)   Average Weekly Net Sales for restaurants open 53 weeks: $12,019.

(iv)    Average Weekly Net Sales for restaurants open less than 53 weeks: $14,444.

(v)     Cost of Goods for restaurants open 53 weeks: 23.7%.

(vi)    Cost of Goods for restaurants open less than 53 weeks: 23.6%.

(vii)   Hourly Labor for restaurants open 53 weeks: 16.7%.

(viii)  Hourly Labor for restaurants open less than 53 weeks: 16.5%.

(b)  In the FDD issued October 27, 2014:

(i)     Annual Net Sales low: $580,000.

(ii)    Annual Net Sales medium: $780,000.

(iii)   Annual Net Sales high: $1,111,000.

(iv)    Food Cost low: $165,000 and 28.4%.

15

(v)   Food Cost medium: $217,000 and 27.8%.

(vi)  Food Cost high: $294,000 and 26.5%.

(vii)  Total Payroll Cost low: $243,000 and 41.9%.

(viii) Total Payroll Cost medium: $287,000 and 36.8%.

(ix)  Total Payroll Cost high: $348,000 and 31.4%.

(x)   Operating Expense low: $95,000 and 16.3%.

(xi)  Operating Expense medium: $115,000 and 14.7%.

(xii)  Operating Expense high: $143,000 and 12.9%.

(xiii) EBITDAR low: $78,000 and 13.4%.[3]

(xiv) EBITDAR medium: $161,000 and 20.6%.

(xv)  EBITDAR high: $324,000 and 29.2%.

(c) In the FDD issued October 26, 2015:

(i)    Annual Net Sales low: $613,000.

(ii)   Annual Net Sales medium: $932,000.

(iii)  Annual Net Sales high: $1,184,000.

(iv)  Food Cost low: $165,000 and 26.9%.

(v)   Food Cost medium: $255,000 and 27.4%.

(vi)  Food Cost high: $314,000 and 26.6%.

(vii)  Total Payroll Cost low: $199,000 and 32.5%.

(viii) Total Payroll Cost medium: $258,000 and 27.7%.

(ix)  Total Payroll Cost high: $286,000 and 24.1%.

(x)   Operating Expense low: $143,000 and 23.3%.

---

[3] In the FDD Pie Five defined EBITIDAR as "Earnings Before Interest, Taxes, Depreciation & Amortization, and Rent".

       (xi)  Operating Expense medium: $186,000 and 19.9%.

       (xii)  Operating Expense high: $236,000 and 19.9%.

       (xiii) EBITDAR low: $106,000 and 17.3%.

       (xiv) EBITDAR medium: $233,000 and 25.0%.

       (xv)  EBITDAR high: $348,000 and 29.4%.

**ANSWER:** Defendants admit that the FDDs contained Item 19 financial performance representations. Defendants also admit that, because there were relatively few franchised stores at the time, the disclosures were based upon company-owned stores, a fact that was fully disclosed. Defendants further admit that Paragraph 36 partially, but not fully, quotes material from the respective Item 19 disclosures. Defendants refer to the full disclosures for their content and input. Defendants deny the remaining allegations contained in Paragraph 36 of the Complaint.

37. Pie Five's Item 19 disclosures in 2013, 2014 and 2015 were calculated to create the impression that the Pie Five restaurants owned by the franchisor were profitable. That intended impression was false, deceptive and materially misleading.

**ANSWER:** Defendants deny the allegations contained in Paragraph 37 of the Complaint.

38. Pie Five exacerbated its deceptive presentation of Item 19 financial performance representations in its 2013, 2014 and 2015 in these ways:

(a) Pie Five's separation of its grid into low, medium and high was misleading because it was not based on the number of restaurants in each tier. It was an artificial separation based on preconceived tiers. In reality, most of the company restaurants were in the low tier.

17

(b) In the "other expense" category, royalties (to be paid by the franchisee to franchisor) is not calculated or included, or footnoted as not included. As an industry standard most franchisors restate their disclosures for company-owned restaurants to include a royalty proxy number.

(c) Pie Five failed to acknowledge differences in performance based on geographic markets, concealing the known difficulty in achieving sales in new markets.

**ANSWER:** Defendants deny the allegations contained in Paragraph 38 of the Complaint.

39. In 2016, as sales and profitability continued to deteriorate Pie Five stopped making financial performance representations in its FDD.

**ANSWER:** Defendants deny the allegations contained in Paragraph 39 of the Complaint.

40. In early 2016, after Dissette had franchised with Pie Five in Indiana and Iowa, Randall Gier at Pie Five proposed that Dissette enter the Chicago area market as a franchisee. Specifically, Randall Gier proposed that Dissette acquire an existing company-owned Pie Five restaurant in Schaumburg and open a second Pie Five at a location that Pie Five had found in Rolling Meadows.

**ANSWER:** Defendants deny the allegations contained in Paragraph 40 of the Complaint. Defendants aver that, in fact, Dissette approached Pie Five in 2015 about obtaining a store or stores in the Chicago market.

41. In late January or early February 2016, Dissette asked Pie Five to provide its financial statements for the existing Schaumburg restaurant showing its specific food and labor

18

costs and its profits and losses. Pie Five declined this request, claiming it could disclose nothing except net sales (gross sales less sales taxes).

**ANSWER:** Defendants deny the allegations contained in Paragraph 41 of the Complaint. Defendants aver that Dissette requested "updated sales numbers," which were provided.

42. On or about February 3, 2016, Pie Five supplied Dissette with net sales for the Schaumburg restaurant. Dissette was sufficiently impressed that he agreed to purchase the assets of this restaurant from Pie Five and enter a franchise agreement and sub-lease for this location.

**ANSWER:** Defendants admit that Dissette was provided the sales numbers he requested for the Schaumburg store on or about February 3, 2016. Defendants aver that the figures provided showed that sales were lower at the restaurant than they had been previously. Defendants deny the remaining allegations contained in Paragraph 42 of the Complaint.

43. However, unknown to Dissette, Pie Five had deceptively spiked sales upward at the Schaumburg restaurant. Pie Five had distributed in the Schaumburg area some 3,000 unlimited "get a free pizza" coupons with no expiration date and had published "buy one/get one free" coupons in local newspapers. On information and belief these promotions were not part of any system wide marketing program that Dissette would have been familiar with. These promotions were undertaken at the Schaumburg location to inflate net sales without regard to profitability, making this restaurant appear more attractive than it was.

**ANSWER:** Defendants deny the allegations contained in Paragraph 43 of the Complaint.

44. Also among the required disclosures mandated by the FTC Franchise Rule, Item 8 entitled "*Restrictions on Sources of Products and Services*" requires the franchisor to "disclose

the franchisee's obligations to purchase or lease goods, services, supplies, fixtures, equipment, inventory, computer hardware and software, real estate, or comparable items related to establishing or operating the franchised business either from the franchisor, its designee, or suppliers approved by the franchisor, or under the franchisor's specifications [and to] [i]nclude obligations to purchase imposed by the franchisor's written agreement or by the franchisor's practice." (See 16 CFR §436.5(g)). Item 8 further requires, without limitation, "the franchisor [to disclose whether it] negotiates purchase arrangements with suppliers, including price terms, for the benefit of franchisees." (See 16 CFR §436.5(g)(10).

**ANSWER:** Defendants admit that Paragraph 44 of the Complaint purports to summarize various legal and regulatory requirements. Defendants aver that they have complied with all such requirements. Defendants deny the remaining allegations contained in Paragraph 44 of the Complaint.

45. In each of its FDDs provided to Plaintiffs, Pie Five disclosed in Item 8 that:

> We negotiate system-wide purchasing to maximize the combined purchasing power benefit of all Pie Five Restaurants and reserve the right to continue to negotiate system-wide purchasing arrangements, including pricing terms, with suppliers for the benefit of all Pie Five Restaurants.

**ANSWER:** Defendants admit that Paragraph 45 of the Complaint quotes one sentence out of the entire Item 8 disclosure in Pie Five's FDDs. Defendants refer to the entire Item 8 for its content and import. Defendants deny the remaining allegations contained in Paragraph 45 of the Complaint.

46. Pie Five's representations that it would "maximize the combined purchasing power benefit of all Pie Five Restaurants" and negotiate with suppliers for the benefit of all Pie Five Restaurants" were false when made and continue to be false. Contradicting these representations, Pie Five repeatedly put its own interests in collecting rebates or other

20

remuneration from suppliers ahead of the interests of its franchisees.

**ANSWER:** Defendants deny the allegations contained in Paragraph 46 of the Complaint.

47. Without limitation, Pie Five has designated its affiliate Norco and Norco's distributor Performance Food Group Company ("PFG") as the franchisees' food suppliers. On information and belief, Pie Five receives a rebate from PFG equal to 2.5% of all franchisee purchases. This rebate was not disclosed in the FDDs given to Plaintiffs. The existence of this rebate, and Pie Five's desire to keep it for itself, motivated Pie Five to enter a commercially unreasonable vendor relationship contradicting the Item 8 representation alleged in paragraph 45. This is true because:

    (a) PFG does not provide below market pricing or even fair market pricing to Plaintiffs as franchisees. Several local suppliers such as Greco Produce have quoted Plaintiffs as much as 30% lower on most items. In no way can Pie Five plausibly claim that its selection of this vendor served to "maximize the combined purchasing power benefit of all Pie Five Restaurants" as Pie Five falsely represented in its FDDs.

    (b) PFG does not have adequate facilities to supply the growing Pie Five system. All Plaintiffs' PFG food orders for restaurants in Indiana, Iowa and Illinois are shipped out of one PFG warehouse in Rock Island, Illinois, substantially adding to the cost and diminishing serviceability. Other national distributors such as Sysco Food Service have items stocked locally and therefore provide better pricing and serviceability.

    (c) PFG cannot handle emergency situations for it does not carry generic

products. In December 2016, when a certain brand of chicken breast strips was recalled for being potentially undercooked, PFG did not have a substitute available or lined up. As a result, Plaintiffs could not offer chicken menu items.

(d) The December 2016 chicken unavailability was not unique. In dealing with PFG as mandated by Pie Five, Plaintiffs have been continuously experiencing defective performance from PFG. Delays in delivery, lack of inventory, and bad or thawed food supplies frequent to an extent that seriously damage Plaintiffs' ability to operate. Some additional examples, without limitation:

    (i)    On December 6, PFG failed to deliver medium size cup lids prevented Plaintiffs at the Mishawaka restaurant from selling medium size beverages on its grand opening day.

    (ii)    In December, 2016, PFG failed to deliver the promised 5 times a week during Mishawaka's first month of operation, leaving Mishawaka restaurants out of inventories to prepare multiple number of hot sale food items.

**ANSWER:** Defendants admit that Norco is the designated supplier for certain products and that Performance Food Group ("PFG") is its authorized distributor. Defendants admit that a rebate is received on franchisee purchases from Norco distributed by PFG, but Defendants aver that the potential rebate was disclosed to Plaintiffs in the FDDs and that much of it is refunded to Plaintiffs as an early payment discount. Defendants deny the remaining allegations contained in Paragraph 47 of the Complaint.

48. On December 11, 2016, as PFG's performance became worse and worse, Pie Five

refused Plaintiffs' express request to patronize another vendor to supplement PFG. This denial was not in good faith. It was motivated by RAVE and Pie Five's desire to collect the 2.5% rebate.

**ANSWER:** Defendants deny the allegations contained in Paragraph 48 of the Complaint.

49. On or about September 4, 2014, before buying any Pie Five franchises, Dissette attended the franchise "Discovery Day" at Pie Five's corporate office in The Colony, Texas. Pie Five's representatives presented the FDD and explained their franchise program.

**ANSWER:** Defendants admit that Dissette attended the Discovery Day program at Pie Five's corporate headquarters on or about September 4, 2014. Defendants deny the remaining allegations contained in Paragraph 49 of the Complaint.

50. At Discovery Day, Dissette, referring to his extensive prior experience as a franchisee in the "Jimmy Johns" system, stated as unequivocally as possible that he would not purchase any franchises if Pie Five was receiving rebates or any form of "sheltered income" from suppliers derived from franchisee purchases.

**ANSWER:** Defendants deny the allegations contained in Paragraph 50 of the Complaint. Defendants aver that the potential rebate is disclosed in Item 8 of Pie Five's FDDs as well as in the applicable franchise agreements.

51. Responding to Dissette at Discovery Day, Defendant Mark Ramage of Pie Five omitted to disclose an existing rebate from PFG and/or NORCO that Pie Five was not remitting to or sharing with the franchisees. He represented that if Pie Five received rebates or other monies from suppliers based on franchisee purchases, such payments would be returned "directly to the franchisees" excepting only payments generated on proprietary items. Dissette believed

23

Ramage and relied on his representations. However, on information and belief, omitting the PFG/Norco rebate and the representation of how Pie Five would handle such rebates or similar payments were false when made as the PFG relationship, including the 2.5% rebate that Pie Five kept for itself was established before that occasion.

**ANSWER:**  Defendants deny the allegations contained in Paragraph 51 of the Complaint.  Defendants aver that the potential rebate is disclosed in Item 8 of Pie Five's FDDs as well as in the franchise agreements.

52.     On or about October 4, 2016, at a Pie Five brand summit, Pie Five interim CEO Clinton Colman disclosed that Pie Five has been receiving a previously undisclosed 2.5% rebate from Norco and PFG derived from franchisee purchases.

**ANSWER:**  Defendants deny the allegations contained in Paragraph 52 of the Complaint.  Defendants aver that the potential rebate is disclosed in Item 8 of Pie Five's FDDs as well as in the franchise agreements.  Defendants further aver that most of the rebate funds an early payment discount to franchisees.

53.     Pie Five has provided no proof that the rebates were returned to or expended for the benefit of the franchisees.

**ANSWER:**  Defendants deny the allegations contained in Paragraph 53 of the Complaint.

54.     Also among the disclosures mandated by the FTC Franchise Rule, Item 6 entitled "*Other Fees*" requires the franchisor (the party selling franchises) to disclose "all other fees [beyond the "Initial Fees" that are paid to acquire a franchise] that the franchisee must pay to the franchisor or its affiliates, or that the franchisor or its affiliates impose or collect in whole or in part for a third party" during the term of the franchise agreement. (See 16 CFR §436.5(e)).

**ANSWER:** Defendants admit that Paragraph 54 of the Complaint purports to summarize various legal and regulatory requirements. Defendants aver that they have complied with all such requirements. Defendants deny the remaining allegations contained in Paragraph 54 of the Complaint.

55. Pie Five violated its requirements under Item 6. It failed to disclose that it would require, and has required, Plaintiffs and other franchisees to pay to Pie Five (through the logistics of an ACH draft) amounts being collected to pay Performance Food Group (PFG) for purchases made by the franchisee. Pie Five has gone so far as to threaten Plaintiffs with franchise termination if Plaintiffs refuse to comply with these unlawful ACH drafts.

**ANSWER:** Defendants deny the allegations contained in Paragraph 55 of the Complaint.

56. On information and belief, Pie Five is seeking to profit on the "float" created by these ACH drafts. Pie Five's practice is to draft from Plaintiffs on net 7-day terms, but on information and belief Pie Five delays in paying PFG. Because of delay in paying by Pie Five, PFG has put Plaintiffs on a credit hold, claiming that Plaintiffs are averaging 43 days to pay. Adding to the problem, it appears from RAVE's SEC filings that RAVE and its subsidiaries are close to being insolvent. This exposes Plaintiff Carl Dissette to unacceptable risk as he had to guaranty amounts due to PFG and is at personal risk if Pie Five defaults to PFG after drafting from Plaintiffs. The corporate Plaintiffs have the same risk.

**ANSWER:** Defendants deny the allegations contained in Paragraph 56 of the Complaint. Defendants aver that Plaintiffs do not make purchases from PFG and do not have a credit risk vis-à-vis PFG.

57. In entering multiple franchise relationships with Plaintiffs, Pie Five omitted to

disclose that it would expose Plaintiffs to avoidable risk to creditors through business practices implemented by Pie Five.

**<u>ANSWER</u>:** Defendants deny the allegations contained in Paragraph 57 of the Complaint.

58. The Pie Five franchise agreements, like all franchise agreements, are long-term relational contracts. In drafting these franchise agreements, it is impossible to foresee all developments that will occur over the contract's term. Therefore, Pie Five as the franchisor vests itself with substantial discretion on its performance over the term of the franchise. For example:

(a) Under Section 8.4.1, Pie Five has the discretion to establish one or more Regional Advertising Funds. In addition, Pie Five has the discretion to modify the amounts the franchisees must contribute.

(b) Under Section 8.4.2, Pie Five has the discretion over all advertising, marketing, and public relations programs and activities financed by the Regional Advertising Fund.

(c) Under Section 8.5.3, Pie Five has the discretion to approve or disapprove all sales promotion materials and advertising submitted by franchisees.

(d) Under Section 10.2, Pie Five has the discretion to provide or not provide opening assistance to franchisees.

(e) Under Section 10.1 and 10.3, Pie Five has the discretion to provide or not provide, as it deemed appropriate, pre-opening and post-opening assistance to franchisees.

(f) Under Section 11.3, Pie Five has the discretion to modify the operation manual.

(g) Under Section 12.2, Pie Five has the discretion to make system modifications, including modifications to the Manual, the menu, the required equipment, the signs, the Proprietary Marks and the Trade Dress.

(h) Under Section 12.3, Pie Five has the discretion to change the mandatory and optional menu items, recipes, ingredients and other products and services. In addition, Pie Five has the discretion to require franchisees sell certain brands and prohibit franchisees from selling other brands.

(i) Under Section 12.6.1, Pie Five has the discretion to designate the source of all food and non-food products, supplies, equipment and services that franchisees purchase from third parties.

(j) Under Section 12.6.3, Pie Five has the discretion to retain any suppliers' rebates, contribute them to the Brand Fund and/or pay franchisees their pro rata share of such rebates.

**ANSWER:**     Paragraph 58 of the Complaint purports to summarize various terms of the franchise agreements.  Defendants refer to the full agreements for their content and import. Defendants deny the remaining allegations contained in Paragraph 58 of the Complaint.

59.     In breach of express and implied duties under Section 5.1 of its franchise agreements Pie Five has failed to deliver commercially reasonable store design plans that would enable franchisees to meet the brand promise to deliver a pizza in 5 minutes. In 2015, after specific complaints from Dissette after he opened the Washington Street restaurant (Indianapolis) on unreasonable delays in the ability to serve customers quickly during a busy lunch hour, Pie Five scrambled to change its designs, to include (for example) a second cash register. Plaintiffs incurred costs to remodel their space to meet the new design standard, and

also incurred higher labor costs in staffing the second register. Pie Five announced this change would be system wide, but then, only a few months later Pie Five rescinded the new designs. Overall, Pie Five is still experimenting for the right design, and its claim in the franchise agreements to have developed a workable system including design items is false. The design problems affect each restaurant to varying degrees.

**ANSWER:** Defendants deny the allegations contained in Paragraph 59 of the Complaint.

60.     In breach of express and implied duties under Section 12.6.1 of its franchise agreements for each of Plaintiffs' franchised restaurants Pie Five has failed to designate and establish commercially reasonable vendor relationships. These problems are most pronounced with PFG, which is the largest vendor but also extend to linen and detergent supply, and to the services provided by Coca Cola Company, which are inferior to what franchisees in other franchised brands like Jimmy Johns receive.

**ANSWER:** Defendants deny the allegations contained in Paragraph 60 of the Complaint.

61.     In breach of express and implied duties under Sections 9 and 10 of its franchise agreements for each of Plaintiffs' franchised restaurants Pie Five has failed to provide commercially reasonable support and training. Pie Five has failed to respond to Plaintiffs' repeated requests for training, evaluation, and assistance on two new Indiana restaurants (Mishawaka and Castleton); and has underperformed in this category at each location. Plaintiffs must largely fend for themselves. Pie Five is not earning its royalty income under the franchise agreements.

**ANSWER:** Defendants deny the allegations contained in Paragraph 61 of the

Complaint.

62.     Pie Five has not even met the basic obligation of designating a contact person to call as problems arise. In May 2016, the Pie Five Chicago area manager, Eddie Mendoza, resigned. Pie Five has not designated a contact person for Plaintiffs for over six months.

**ANSWER:**    Defendants deny the allegations contained in Paragraph 62 of the Complaint.  Defendants aver that Mr. Mendoza was responsible for operation of company restaurants, not franchised restaurants.  Defendants aver that Dissette is regularly in contact with multiple Pie Five representatives.

63.     In entering multiple franchise agreements with Plaintiffs Pie Five omitted to disclose its lack of capacity and lack of intent to adequately perform its express and implied contractual obligations in a commercially reasonable manner and in a manner consistent with the implied covenant of good faith and fair dealing.

**ANSWER:**    Defendants deny the allegations contained in Paragraph 63 of the Complaint.

64.     Pie Five's performance failures constitute "promissory fraud" as Pie Five lacked any reasonable basis to believe that it could meet its contractual obligations, and Pie Five made false promises it knew it could not keep as an integral part of its larger scheme to defraud the Plaintiffs.

**ANSWER:**    Defendants deny the allegations contained in Paragraph 64 of the Complaint.

65.     In the Chicago area, Pie Five has abused its discretion by unfairly favoring its company owned restaurants over Plaintiffs' franchises. For example:

        (a) Pie Five implemented an online ordering system for its company- owned units

in or about August 2016, but failed to make it available to the Plaintiffs in the Chicago area despite Plaintiffs' repeated requests although the same program is available to franchisees in other markets. This has damaged Plaintiffs in the busy holiday season.

(b) Pie Five conducted an online catering program that the Illinois franchisees were not allowed to participate in. On information and belief some of these catering sales were made in the trade areas of the Schaumburg and Rolling Meadows franchises and deprived those franchises of sales revenue.

**ANSWER:** Defendants deny the allegations contained in Paragraph 65 of the Complaint.

66.     In entering multiple franchise agreements with Plaintiffs Pie Five omitted to disclose its intent to blatantly favor its corporate owned restaurants over the Plaintiffs' franchises and its intent not to perform in a manner consistent with the implied covenant of good faith and fair dealing.

**ANSWER:** Defendants deny the allegations contained in Paragraph 66 of the Complaint.

67.     The conduct of the Defendants' alleged herein was intentional such that, to the fullest extent allowed by law, the Plaintiffs should be entitled to recover punitive damages in an amount sufficient to punish the Defendants and deter others from like misconduct.

**ANSWER:** Defendants deny the allegations contained in Paragraph 67 of the Complaint.

68.     Furthermore, the Defendants should not be permitted to escape liability for punitive damages by relying on alleged contractual waivers, which should be declared void as a

matter of public policy or under statutory anti-waiver provisions.

**ANSWER:** Defendants aver that the parties mutually waived any claims for punitive damages against each other in the franchise agreements. Defendants deny the remaining allegations contained in Paragraph 68 of the Complaint.

## Count I

69. Plaintiffs incorporate paragraphs 1-68 as paragraphs 1- 68 of this Count I against all Defendants.

**ANSWER:** Defendants incorporate their responses above to Paragraphs 1-68 as their response to Paragraph 69 of the Complaint.

70. In the franchise sales pertaining to the Schaumberg, Illinois franchise, Pie Five made misrepresentations and omissions that violated sub- paragraphs (a), (b) and (c) of Section 6 of the IFDA, entitled "fraudulent practices," which provide that:

> In connection with the offer and sale of any franchise made in this State, it is unlawful for any person, directly or indirectly, to:
> (a) employ any device, scheme or artifice to defraud.
> (b) make any untrue statement of a material fact or omit to state a material fact necessary in order to make the statement made in the light of the circumstances under which they are made, not misleading.
> (c) engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.
> (815 ILCS 705/6).

**ANSWER:** Defendants admit that Paragraph 70 of the Complaint partially quotes a statutory provision. Defendants refer to the full statute for its content and import. Defendants deny the remaining allegations contained in Paragraph 70 of the Complaint.

71. Pie Five's misrepresentations in violation of Section 6 of the IFDA are alleged in paragraphs 29, 36 to 38, 46 to 48, 51 and 55, and in those other paragraphs that relate to the same topics as these enumerated paragraphs.

**ANSWER:** Defendants incorporate their responses above to Paragraphs 29, 36 to 38,

31

46 to 48, 51, and 55 of the Complaint. Defendants deny the remaining allegations contained in Paragraph 71 of the Complaint.

72. Pie Five's omissions in violation of Section 6 of the IFDA are alleged in paragraphs 41 to 43, 51, 57, 63 and 66, and in those other paragraphs that relate to the same topics as these enumerated paragraphs.

**ANSWER:** Defendants incorporate their responses above to Paragraphs 41 to 43, 51, 57, 63, and 66 of the Complaint. Defendants deny the remaining allegations contained in Paragraph 72 of the Complaint.

73. Pie Five's promissory fraud as alleged in paragraph 64 (and in those other paragraphs that relate to the same topics as paragraph 64) violated Section 6 of the IFDA.

**ANSWER:** Defendants incorporate their response above to Paragraph 64 of the Complaint. Defendants deny the remaining allegations contained in Paragraph 73 of the Complaint.

74. Defendant RAVE is named in Count I under Section 26 of the IFDA as a person that directly or indirectly controls Pie Five. Without limitation, this control is inherent in the parent/subsidiary relationship and stated in RAVE's filings with the SEC cited herein.

**ANSWER:** Defendants deny the allegations contained in Paragraph 74 of the Complaint.

75. Defendant Gier is named in Count I under Section 26 of the IFDA as a principal executive officer of Pie Five.

**ANSWER:** Paragraph 75 is not asserted against these answering Defendants and no response is required. To the extent that a response is deemed to be required, Defendants deny the allegations contained in Paragraph 75 of the Complaint.

76. Defendant Ramage is named in Count I under Section 26 of the IFDA as an employee of Pie Five who materially aided in acts or transactions constituting the violation.

**ANSWER:** Paragraph 76 is not asserted against these answering Defendants and no response is required. To the extent that a response is deemed to be required, Defendants deny the allegations contained in Paragraph 76 of the Complaint.

77. Plaintiffs contend that Section 6 creates strict liability and that proof of reliance is not required. In the alternative Plaintiffs allege that they reasonably and justifiably relied on the truth of the FDDs they received from Pie Five and on the accompanying verbal representations. Also in the alternative Plaintiffs allege that to the extent possible they relied on the state of mind created by Pie Five's omissions.

**ANSWER:** The allegations contained in Paragraph 77 of the Complaint are in part legal contentions to which no response is required. Defendants deny the remaining allegations contained in Paragraph 77 of the Complaint.

78. As the direct, intended, and proximate result of Defendants' Section 6 violations, Plaintiffs Dissette and B & C Resources, Inc. were induced to purchase the Rolling Meadows and Schaumburg franchises and to invest in the ownership and operation of those restaurants and the undertaking of related commitments such as leases and guarantees.

**ANSWER:** Defendants deny the allegations contained in Paragraph 78 of the Complaint.

79. Under Section 26 of the Illinois Franchise Disclosure Act, 815 ILCS 705/26, Plaintiffs Dissette and B & C Resources, Inc. reserve their election of remedies. They may elect to rescind the Schaumburg franchise agreement they entered with Pie Five. For this conditional rescission demand, and without limitation:

(a) Plaintiffs offer to allow Pie Five to take over the possession and operation of the Schaumburg franchises.

(b) Plaintiffs have paid monies to Pie Five for this franchise and its assets. Plaintiffs demand the return of all monies paid to Pie Five plus interest at the highest rate allowed by law.

(c) Plaintiffs are exposed to creditors such as PFG. Plaintiffs demand that Pie Five pay to Plaintiffs all amounts necessary to pay all sums owed to any trade creditors.

(d) Plaintiffs have lost money in the investment to open and the operation of this restaurant. They will present a full claim for their losses through the date that Pie Five accepts the return of this restaurant or its last day of business, whichever may occur first. Plaintiffs demand full reimbursement of their losses as part of the rescission.

**ANSWER:** Defendants deny the allegations contained in Paragraph 79 of the Complaint.

80. In the alternative to their demand for rescission in Count I, Plaintiffs Dissette and B & C Resources, Inc. reserve their right to seek the recovery of all damages available under law in connection with the Schaumburg franchise in such amounts as will be proven at trial including actual, consequential and lost profits, and punitive damages.

**ANSWER:** Defendants deny the allegations contained in Paragraph 80 of the Complaint.

81. Under Section 26 of the IFDA Plaintiffs claim costs of suit including, without limitation, reasonable attorney's fees.

34

**ANSWER:** Defendants deny the allegations contained in Paragraph 81 of the Complaint.

## Count II

82.     Plaintiffs incorporate paragraphs 1-81 as paragraphs 1- 81 of this Count II against all Defendants.

**ANSWER:** Defendants incorporate their responses above to Paragraphs 1-81 as their response to Paragraph 82 of the Complaint.

83.     In the franchise sales pertaining to the Rolling Meadows, Illinois franchise, Pie Five made misrepresentations and omissions that violated sub- paragraphs (a), (b) and (c) of Section 6 of the IFDA, entitled "fraudulent practices," which provide that:

> In connection with the offer and sale of any franchise made in this State, it is unlawful for any person, directly or indirectly, to:
> (d) employ any device, scheme or artifice to defraud.
> (e) make any untrue statement of a material fact or omit to state a material fact necessary in order to make the statement made in the light of the circumstances under which they are made, not misleading.
> (f) engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.
> (815 ILCS 705/6).

**ANSWER:** Defendants admit that Paragraph 83 of the Complaint partially quotes a statute. Defendants refer to the full statute for its content and import. Defendants deny the remaining allegations contained in Paragraph 83 of the Complaint.

84.     Pie Five's misrepresentations in violation of Section 6 of the IFDA are alleged in paragraphs 29, 36 to 38, 46 to 48, 51 and 55, and in those other paragraphs that relate to the same topics as these enumerated paragraphs.

**ANSWER:** Defendants incorporate their responses above to Paragraphs 29, 36 to 38, 46 to 48, and 55 of the Complaint. Defendants deny the remaining allegations contained in Paragraph 84 of the Complaint.

35

85. Pie Five's omissions in violation of Section 6 of the IFDA are alleged in paragraphs 51, 57, 63 and 66, and in those other paragraphs that relate to the same topics as these enumerated paragraphs.

**ANSWER:** Defendants incorporate their responses above to Paragraphs 51, 57, 63, and 66 of the Complaint. Defendants deny the remaining allegations contained in Paragraph 85 of the Complaint.

86. Pie Five's promissory fraud as alleged in paragraph 64 (and in those other paragraphs that relate to the same topics as paragraph 64) violated Section 6 of the IFDA.

**ANSWER:** Defendants incorporate their response above to Paragraph 64 of the Complaint. Defendants deny the remaining allegations contained in Paragraph 86 of the Complaint.

87. Defendant RAVE is named in Count II under Section 26 of the IFDA as a person that directly or indirectly controls Pie Five. Without limitation, this control is inherent in the parent/subsidiary relationship and stated in RAVE's filings with the SEC cited herein.

**ANSWER:** Defendants deny the allegations contained in Paragraph 87 of the Complaint.

88. Defendant Gier is named in Count II under Section 26 of the IFDA as a principal executive officer of Pie Five.

**ANSWER:** Paragraph 88 is not asserted against these answering Defendants and no response is required. To the extent that a response is deemed to be required, Defendants deny the allegations contained in Paragraph 88 of the Complaint.

89. Defendant Ramage is named in Count II under Section 26 of the IFDA as an employee of Pie Five who materially aided in acts or transactions constituting the violation.

**ANSWER:** Paragraph 89 is not asserted against these answering Defendants and no response is required. To the extent that a response is deemed to be required, Defendants deny the allegations contained in Paragraph 89 of the Complaint.

90.     Plaintiffs contend that Section 6 creates strict liability and that proof of reliance is not required. In the alternative Plaintiffs allege that they reasonably and justifiably relied on the truth of the FDDs they received from Pie Five and on the accompanying verbal representations. Also in the alternative Plaintiffs allege that to the extent possible they relied on the state of mind created by Pie Five's omissions.

**ANSWER:** The allegations contained in Paragraph 90 of the Complaint are in part legal contentions to which no response is required. Defendants deny the remaining allegations contained in Paragraph 90 of the Complaint.

91.     As the direct, intended, and proximate result of Defendants' Section 6 violations, Plaintiffs Dissette and B & C Resources, Inc. were induced to purchase the Rolling Meadows and Schaumburg franchises and to invest in the ownership and operation of those restaurants and the undertaking of related commitments such as leases and guarantees.

**ANSWER:** Defendants deny the allegations contained in Paragraph 91 of the Complaint.

92.     Under Section 26 of the Illinois Franchise Disclosure Act, 815 ILCS 705/26, Plaintiffs Dissette and B & C Resources, Inc. reserve their election of remedies. They may elect to rescind the Rolling Meadows franchise agreement they entered with Pie Five. For this conditional rescission demand, and without limitation:

> (a) Plaintiffs offer to allow Pie Five to take over the possession and operation of the Rolling Meadows franchise.

(b) Plaintiffs have paid monies to Pie Five for this franchise. Plaintiffs demand the return of all monies paid to Pie Five plus interest at the highest rate allowed by law.

(c) Plaintiffs are exposed to creditors such as PFG. Plaintiffs demand that Pie Five pay to Plaintiffs all amounts necessary to pay all sums owed to any trade creditors.

(d) Plaintiffs have lost money in the investment to open and the operation of this restaurant. They will present a full claim for their losses through the date that Pie Five accepts the return of this restaurants or its last day of business, whichever may occur first. Plaintiffs demand full reimbursement of their losses as part of the rescission.

**ANSWER:** Defendants deny the allegations contained in Paragraph 92 of the Complaint.

93. In the alternative to their demand for rescission in Count II, Plaintiffs Dissette and B & C Resources, Inc. reserve their right to seek the recovery of all damages available under law in connection with the Rolling Meadows franchise in such amounts as will be proven at trial including actual, consequential and lost profits, and punitive damages.

**ANSWER:** Defendants deny the allegations contained in Paragraph 93 of the Complaint.

94. Under Section 26 of the IFDA Plaintiffs claim costs of suit including, without limitation, reasonable attorney's fees.

**ANSWER:** Defendants deny the allegations contained in Paragraph 94 of the Complaint.

38

<u>**Count III**</u>

95.     Plaintiffs incorporate paragraphs 1-94 as paragraphs 1-94 of this Count III against Pie Five.

**<u>ANSWER</u>:**     Defendants incorporate their responses above to Paragraphs 1-94 as their response to Paragraph 95 of the Complaint.

96.     In the franchise sales pertaining to the Indiana Area Developer Agreement and each of the Indiana franchises (Whitestown, Washington Street, Mishawaka and Castleton) Pie Five made misrepresentations and omissions that violated sub-paragraphs (1), (2) and (3) of Section 23-2-2.5-27 of the Indiana Code, entitled "violations", which provide that:

> It is unlawful for any person in connection with the offer, sale or purchase of any franchise, or in any filing made with the commissioner, directly or indirectly:
> (1)     To employ any device, scheme or artifice to defraud;
> (2)     To make any untrue statements of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of circumstances under which they are made, not misleading; or
> (3)     To engage in any act which operates or would operate as a fraud or deceit upon any person.
> (Indiana Code §23-2-2.5-27).

**<u>ANSWER</u>:**     Defendants admit that Paragraph 96 of the Complaint partially quotes a statute.  Defendants refer to the full statute for its content and import.  Defendants deny the remaining allegations contained in Paragraph 96 of the Complaint.

97.     Pie Five's misrepresentations in violation of the anti-fraud provisions of the Indiana Code are alleged in paragraphs 29, 36 to 38, 46 to 48, 51 and 55, and in those other paragraphs that relate to the same topics as these enumerated paragraphs.

**<u>ANSWER</u>:**     Defendants incorporate their responses above to Paragraphs 29, 36 to 38, 46 to 48, 51, and 55 of the Complaint.  Defendants deny the remaining allegations contained in Paragraph 97 of the Complaint.

98.     Pie Five's omissions in violation of the anti-fraud provisions of the Indiana Code are alleged in paragraphs 51, 57, and 63, and in those other paragraphs that relate to the same topics as these enumerated paragraphs.

**ANSWER:**     Defendants incorporate their response above to Paragraphs 51, 57, and 63 of the Complaint.  Defendants deny the remaining allegations contained in Paragraph 98 of the Complaint.

99.     Pie Five's promissory fraud as alleged in paragraph 64 violated the anti-fraud provisions of the Indiana Code.

**ANSWER:**     Defendants incorporate their response above to Paragraph 64 of the Complaint.  Defendants deny the remaining allegations contained in Paragraph 99 of the Complaint.

100.     Plaintiffs contend that the anti-fraud provisions of the Indiana Code create strict liability and that proof of reliance is not required. In the alternative Plaintiffs allege that they reasonably and justifiably relied on the truth of the FDDs they received from Pie Five and on the accompanying verbal representations. Also in the alternative Plaintiffs allege that to the extent possible they relied on the state of mind created by Pie Five's omissions.

**ANSWER:**     The allegations contained in Paragraph 100 of the Complaint are in part legal contentions to which no response is required.  Defendants deny the remaining allegations contained in Paragraph 100 of the Complaint.

101.     As the direct, intended, and proximate result of Pie Five's violations of the anti-fraud provisions of the Indiana Code, Plaintiffs Dissette and MBT Five, Inc. were induced to purchase the Indiana franchises and to invest in the ownership and operation of those restaurants and the undertaking of related commitments such as leases and guarantees.

**ANSWER:** Defendants deny the allegations contained in Paragraph 101 of the Complaint.

102. To the extent permitted by law, Plaintiffs reserve their election of remedies regarding their Indiana franchises. They reserve their right to seek rescission and will subsequently tender the return of these franchises if they so elect.

**ANSWER:** Defendants deny the allegations contained in Paragraph 102 of the Complaint.

103. Plaintiffs also reserve their right to seek damages and other relief under Section 23-2-2.5-28 of the Indiana Code, IN. I.C. 23-2-2.5-28, including:

> (a) All consequential damages and an interest at eight percent (8%) on the judgment.
>
> (b) Plaintiffs are exposed to creditors such as PFG. Plaintiffs demand that Pie Five pay to Plaintiffs all amounts necessary to pay all sums owed to any trade creditors.
>
> (c) All other damages including punitive damages, and lost profits as allowed by law.

**ANSWER:** Defendants deny the allegations contained in Paragraph 103 of the Complaint.

104. Plaintiffs seek recovery of costs of suit including, without limitation, reasonable attorney's fees.

**ANSWER:** Defendants deny the allegations contained in Paragraph 104 of the Complaint.

## Count IV

105. Plaintiffs incorporate paragraphs 1-104 as paragraphs 1-104 of this Count IV

against Pie Five.

**ANSWER:**    Defendants incorporate their responses above to Paragraphs 1-104 as their response to Paragraph 105 of the Complaint.

106.    Section 12.6 of the written franchise agreements pertaining to the Whitestown, Washington Street, and Mishawaka franchises in Indiana provides that:

> 12.6.1 We have the right to require that all food and non-food products, supplies, equipment and services that you purchase for use, sale or resale in the Franchised Restaurant: (a) meet specifications that we establish from time to time; (b) be purchased only from suppliers that we have consented to (which may include us or our affiliates); and/or (c) be purchased only from a single source or from a limited number of designated sources (which may include us or our affiliates)…
> 12.6.3 We and our affiliates may earn income on direct sales of products, ingredients and/or supplies to you. If we or our affiliates receive any rebates, commissions or other payments from third-party suppliers based on your purchases from them, we may, in our sole discretion, retain the rebates, commissions or other payments, contribute them to the Brand Fund (as defined in Section 8) and/or pay you your pro rata share of such rebates, commissions or other payments based on your purchases from those third-party suppliers.

**ANSWER:**    Paragraph 106 of the Complaint purports to quote a section of the franchise agreement.  Defendants refer to the full franchise agreements for their content and import.  Defendants deny the remaining allegations contained in Paragraph 106 of the Complaint.

107.    Although the parties have not signed a franchise agreement for Castleton, Pie Five is performing as though a written agreement, including Section 12.6 is in place.

**ANSWER:**    Defendants deny the allegations contained in Paragraph 107 of the Complaint.

108.    The Indiana Area Developers Agreement requires all Indiana franchises opened under that agreement to have a written franchise agreement that will contain Section 12.6.

**ANSWER:**    Defendants admit that a written franchise agreement in a disclosed

42

standard form is required. Defendants deny the remaining allegations contained in Paragraph 108 of the Complaint.

109. Section 12.6 of the Indiana franchise agreements is unlawful under sub-paragraphs (1) and (4) of Section 1 of the Indiana Deceptive Franchise Practices Act, Indiana Code § 23-2-2.7-1, entitled "franchise agreement-unlawful provisions," which provide that:

> It is unlawful for any franchise agreement entered into between any franchisor and a franchisee who is either a resident of Indiana or a nonresident who will be operating a franchise in Indiana to contain any of the following provisions:
> (1) Requiring goods, supplies, inventories, or services to be purchased exclusively from the franchisor or sources designated by the franchisor where such goods, supplies, inventories, or services of comparable quality are available from sources other than those designated by the franchisor...
> (4) Allowing the franchisor to obtain money, goods, services, or any other benefit from any other person with whom the franchisee does business, on account of, or in relation to, the transaction between the franchisee and the other person, other than for compensation for services rendered by the franchisor, unless the benefit is promptly accounted for, and transmitted to the franchisee.
> (Indiana Code § 23-2-2.7-1).

**ANSWER:** Defendants admit that Paragraph 109 of the Complaint partially quotes a statute. Defendants refer to the full statute for its content and import. Defendants deny the remaining allegations contained in Paragraph 109 of the Complaint.

110. Pie Five's conduct in violation of this section of the Indiana Deceptive Franchise Practices Act is alleged in paragraphs 48 to 53 and 60, and in those other paragraphs that relate to the same topics as these enumerated paragraphs.

**ANSWER:** Defendants incorporate their responses above to Paragraphs 48 to 53 and 60 of the Complaint above. Defendants deny the remaining allegations contained in Paragraph 110 of the Complaint.

111. As the direct, intended, and proximate result of Pie Five's violations of the Indiana Deceptive Franchise Practices Act, Plaintiffs Dissette and MBT Five, Inc. have been

damaged and these damages are continuing.

**ANSWER:**   Defendants deny the allegations contained in Paragraph 111 of the Complaint.

112.   Under Section 4 of the Indiana Deceptive Franchise Practices Act, IN. I.C. 23-2-2.7-4., Plaintiffs Dissette and MBT Five, Inc. claim:

    (a)  All consequential damages.

    (b)  Reformation of the franchise agreements, but subject to Plaintiffs' reservation of their election of remedies under Count III and at common law and equity.

    (c)  Plaintiffs are exposed to creditors such as PFG. Plaintiffs demand that Pie Five pay to Plaintiffs all amounts necessary to pay all sums owed to any trade creditors.

    (d)  Transmission to Plaintiffs all benefits received by Pie Five derived from all transaction between all suppliers and Plaintiffs.

    (e)  All other damages allowed by law including punitive damages and lost profits.

    (f)  Recovery of costs including attorney's fees to the extent permitted by law.

**ANSWER:**   Defendants deny the allegations contained in Paragraph 112 of the Complaint.

## Count V

113.   Plaintiffs incorporate paragraphs 1-112 as paragraphs 1-112 of this Count V against Pie Five.

**ANSWER:**   Defendants incorporate their responses above to Paragraphs 1-112 as their response to Paragraph 113 of the Complaint.

114.   Pie Five's acts in obtaining benefits from transactions between suppliers and Plaintiffs pertaining to the Indiana franchises violated sub- paragraphs (6) of Section 2 of the

Indiana Deceptive Franchise Practices Act, IN. I.C. 23-2-2.7-2., entitled "unlawful acts and practices", which provide that:

> It is unlawful for any franchisor who has entered into any franchise agreement with a franchisee who is either a resident of Indiana or a nonresident operating a franchise in Indiana to engage in any of the following acts and practices in relation to the agreement:
> (6) Obtaining money, goods, services, or any other benefit from any other person with whom the franchisee does business, on account of, or in relation to, the transaction between the franchisee and the other person, other than compensation for services rendered by the franchisor, unless the benefit is promptly accounted for, and transmitted to the franchisee.
> (Indiana Code § 23-2-2.7-2).

**ANSWER:** Defendants admit that Paragraph 114 of the Complaint partially quotes a statute. Defendants refer to the full statute for its content and import. Defendants deny the remaining allegations contained in Paragraph 114 of the Complaint.

115. As the direct, intended, and proximate result of Pie Five's violations, Plaintiffs Dissette and MBT Five, Inc. were damaged.

**ANSWER:** Defendants deny the allegations contained in Paragraph 115 of the Complaint.

116. Under Section 4 of the Indiana Deceptive Franchise Practices Act, IN. I.C. 23-2-2.7-4., Plaintiffs Dissette and MBT Five, Inc. claim:

(a) All consequential damages.

(b) Reformation of the franchise agreements, but subject to Plaintiffs' reservation of their election of remedies under Count III and at common law and equity.

(c) Plaintiffs are exposed to creditors such as PFG. Plaintiffs demand that Pie Five pay to Plaintiffs all amounts necessary to pay all sums owed to any trade creditors.

(d) Transmission to Plaintiffs all benefits received by Pie Five derived from all

transaction between all suppliers and Plaintiffs.

(e)  All other damages allowed by law including punitive damages and lost profits.

(f)  Recovery of costs including attorney's fees to the extent permitted by law.

**ANSWER:**  Defendants deny the allegations contained in Paragraph 116 of the Complaint.

## Count VI

117.  Plaintiffs incorporate paragraphs 1-116 as paragraphs 1-116 of this Count VI against Pie Five.

**ANSWER:**  Defendants incorporate their responses above to Paragraphs 1-116 as their response to Paragraph 117 of the Complaint.

118.  Pie Five's acts in designating exclusive suppliers pertaining to each of the Iowa franchises (Ankeny and West Des Moines) violated sub-section 9 of Section 537A.10 of the Iowa Code, IOWA. 537A. 10., entitled "Sources of goods or services", which provide that:

> a. A franchisor shall not require that a franchisee purchase goods, supplies, inventories, or services exclusively from the franchisor or from a source or sources of supply specifically designated by the franchisor where such goods, supplies, inventories, or services of comparable quality are available from sources other than those designated by the franchisor.
> (IOWA. 537A. 10)

**ANSWER:**  Defendants admit that Paragraph 118 of the Complaint partially quotes a statute.  Defendants refer to the full statute for its content and import.  Defendants deny the remaining allegations contained in Paragraph 118 of the Complaint.

119.  Although the parties have not signed a franchise agreement for West Des Moines, Pie Five is performing as though a written agreement is in place.

**ANSWER:**  Defendants deny the allegations contained in Paragraph 119 of the Complaint.

120.     The Iowa Area Developers Agreement requires all Indiana franchises opened under that agreement to have a written franchise agreement that will contain the same provisions governing the designation of suppliers.

**ANSWER:**     Defendants admit that a written franchise agreement in a disclosed standard form is required.  Defendants deny the remaining allegations contained in Paragraph 120 of the Complaint.

121.     Pie Five has unreasonably disapproved suppliers.

**ANSWER:**     Defendants deny the allegations contained in Paragraph 121 of the Complaint.

122.     The designated goods, supplies, inventories, and services do not constitute principal goods, supplies, inventories, or services manufactured by Pie Five, nor do such goods, supplies, inventories, or services entitled to protection as a trade secret.

**ANSWER:**     Defendants deny the allegations contained in Paragraph 122 of the Complaint.

123.     As the direct, intended, and proximate result of Pie Five's violations, Plaintiffs Dissette and MBT Five, Inc. were damaged.

**ANSWER:**     Defendants deny the allegations contained in Paragraph 123 of the Complaint.

124.     Under sub-section 13 of Section 537A.10 of the Iowa Code, IOWA. 537A. 10., Plaintiffs Dissette and MBT Five Iowa, Inc. claim:

(a) All consequential damages.

(b) Reformation of the franchise agreements, but subject to Plaintiffs' reservation of their election of remedies under common law and equity.

47

(c) Plaintiffs are exposed to creditors such as PFG. Plaintiffs demand that Pie Five pay to Plaintiffs all amounts necessary to pay all sums owed to any trade creditors.

(d) Transmission to Plaintiffs all benefits received by Pie Five derived from all transaction between all suppliers and Plaintiffs.

(e) Cost of the action including, without limitation, reasonable attorney's fees.

**ANSWER:** Defendants deny the allegations contained in Paragraph 124 of the Complaint.

## Count VII

125. Each Plaintiff incorporates paragraphs 1-124 as paragraphs 1-124 of this Count VII against Pie Five.

**ANSWER:** Defendants incorporate their responses above to Paragraphs 1-124 as their response to Paragraph 125 of the Complaint.

126. In the franchise sales and area development sales alleged herein, Pie Five made material misrepresentations as alleged in paragraphs 29, 36 to 38, 46 to 48, 51 and 55, and in those other paragraphs that relate to the same topics as these enumerated paragraphs.

**ANSWER:** Defendants incorporate their responses above to Paragraphs 29, 36 to 38, 46 to 48, 51, and 55 of the Complaint. Defendants deny the remaining allegations contained in Paragraph 126 of the Complaint.

127. In the franchise sales and area development sales alleged herein, Pie Five made material omissions in violation as alleged in paragraphs 41 to 44, 51, 57, 63 and 66, and in those other paragraphs that relate to the same topics as these enumerated paragraphs.

**ANSWER:** Defendants incorporate their responses above to Paragraphs 41 to 44, 51, 57, 63 and 66 of the Complaint. Defendants deny the allegations contained in Paragraph 127 of

the Complaint.

128.    Pie Five also committed promissory fraud as alleged in paragraph 64 and in those other paragraphs that relate to the same topics as paragraph 64.

**ANSWER:**    Defendants incorporate their responses above to Paragraph 64 of the Complaint.  Defendants deny the remaining allegations contained in Paragraph 128 of the Complaint.

129.    Pie Five knew such representations were false, and by such misrepresentations Pie Five intended to deceive the Plaintiffs. In the alternative Pie Five acted in reckless disregard of the truth.

**ANSWER:**    Defendants deny the allegations contained in Paragraph 129 of the Complaint.

130.    Pie Five knew and intended that by its omissions, Plaintiffs would be deceived. In the alternative Pie Five acted in reckless disregard of the truth.

**ANSWER:**    Defendants deny the allegations contained in Paragraph 130 of the Complaint.

131.    Plaintiffs reasonably and justifiably relied on all of Pie Five's misrepresentations (including those made by its agents such as Ramage) in making their decisions to become area developers and franchisees of Pie Five and making all expenditures and commitments related to these contracts.

**ANSWER:**    Defendants deny the allegations contained in Paragraph 131 of the Complaint.

132.    Plaintiffs reasonably and justifiably relied on the state of mind and impressions created by all of Pie Five's omissions (including those made by its agents such as Ramage) in

49

making their decisions to become area developers and franchisees of Pie Five and making all expenditures and commitments related to these contracts, such as leases, asset purchases, commitments to creditors, and guarantees.

**ANSWER:** Defendants deny the allegations contained in Paragraph 132 of the Complaint.

133. As the direct, intended, and proximate result of Pie Five's acts, misrepresentations, and omissions, each Plaintiff was fraudulently induced to purchase their Pie Five franchises and area developer rights and all expenditures and commitments related to these contracts, such as leases, asset purchases, commitments to creditors, and guarantees.

**ANSWER:** Defendants deny the allegations contained in Paragraph 133 of the Complaint.

134. As the direct, intended, and proximate result of Pie Five's acts, misrepresentations, and omissions, each of the Plaintiffs were injured and damaged.

**ANSWER:** Defendants deny the allegations contained in Paragraph 134 of the Complaint.

135. Plaintiffs reserve their election of remedies. They may elect rescission or the recovery of all damages allowable by law, in amounts that will be proven at trial, and including actual damages, consequential damages, lost profits and punitive damages.

**ANSWER:** Defendants deny the allegations contained in Paragraph 135 of the Complaint.

### COUNT VIII

136. Each Plaintiff incorporates paragraphs 1-135 as paragraphs 1-135 of this Count VIII against Pie Five.

**ANSWER:** Defendants incorporate their responses above to Paragraphs 1-135 as their

response to Paragraph 136 of the Complaint.

137.     This count is conditionally pled in the alternative to Plaintiffs' claims for rescission to which Plaintiffs have reserved their elections of remedies.

**ANSWER:**     Defendants deny the allegations contained in Paragraph 137 of the Complaint.

138.     The Pie Five franchise agreements, like all franchise agreements, are long-term relational contracts. In drafting these franchise agreements, it is impossible to foresee all developments that will occur over the contract's term. Therefore, Pie Five as the franchisor vests itself with substantial discretion on its performance over the term of the franchise.

**ANSWER:**     Defendants deny the allegations contained in Paragraph 138 of the Complaint.

139.     In exercising its substantial discretion under the franchise agreements, Pie Five must be subject to the implied covenant of good faith and fair dealing as developed at common law (the "implied covenant").

**ANSWER:**     Defendants deny the allegations contained in Paragraph 139 of the Complaint.

140.     The Pie Five franchise agreements reveal an intent by Pie Five to avoid being subject to the implied covenant. For example, Pie Five wishes to emphasize that when it has discretion, it means "sole" discretion, suggesting that its exercise of discretion should not be reviewable by a court.

**ANSWER:**     Defendants deny the allegations contained in Paragraph 140 of the Complaint.

141.     The purpose of the implied covenant is to protect contracting parties from conduct

by the other contracting party that is arbitrary, capricious, or unreasonable; evades the spirit of the bargain, lacks diligence, or defeats a party's justifiable expectations; slacks off, willfully renders imperfect performance, or abuses its power to specify terms; acts with improper motives; or interferes with or fails to cooperate with the other party's performance.

**ANSWER:** Defendants deny the allegations contained in Paragraph 141 of the Complaint.

142. Without the implied covenant, Pie Five's promises under its franchise agreements are illusory.

**ANSWER:** Defendants deny the allegations contained in Paragraph 142 of the Complaint.

143. Based on the language of Pie Five's franchise agreements and its conduct as a franchisor, a dispute exists as to whether Pie Five as a franchisor is subject to the implied covenant in carrying out its contractual duties.

**ANSWER:** Defendants deny the allegations contained in Paragraph 143 of the Complaint.

144. Resolution of this dispute is necessary not only to resolve the present case, but to guide the parties in their contract performance.

**ANSWER:** Defendants deny the allegations contained in Paragraph 144 of the Complaint.

145. Pursuant to the Declaratory Judgment Act, 28 U.S. Code § 2201, Plaintiffs seek a judicial declaration that Pie Five is subject to the implied covenant of good faith and fair dealing under each of its franchise agreements with Plaintiffs.

**ANSWER:** Defendants deny the allegations contained in Paragraph 145 of the

Complaint.

## COUNT IX

146.    Each Plaintiff incorporates paragraphs 1-145 as paragraphs 1-145 of this Count IX against Pie Five.

**ANSWER:**    Defendants incorporate this response to Paragraphs 1-145 above as their response to Paragraph 146 of the Complaint.

147.    This count is conditionally pled in the alternative to Plaintiffs' claims for rescission to which Plaintiffs have reserved their elections of remedies.

**ANSWER:**    Defendants deny the allegations contained in Paragraph 147 of the Complaint.

148.    Without limitation, Pie Five has breached its express and implied duties under the franchise agreement, and has damaged the Plaintiffs in multiple ways:

(a) Providing commercially unreasonable and defective store plan designs.

(b) Failing to provide sufficient opening assistance.

(c) Failing to provide sufficient on-going assistance.

(d) Failing to provide online ordering training and to allow participation in this program.

(e) Failing to remit suppliers' rebates to the franchisees and failing to account for such rebates.

(f) Mandating the use of underperformed suppliers with no competitive price.

(g) Failing to supply commercially reasonable marketing plans and failing to approve Plaintiffs' marketing proposal.

(h) Encroaching Plaintiffs' trade areas in Rolling Meadows and Schaumburg with its catering program.

53

**ANSWER:** Defendants deny the allegations contained in Paragraph 148 of the Complaint.

149.    In all of the ways alleged in paragraph 148, without limitation, Pie Five breached its express and implied duties under the franchise agreement; has been arbitrary, capricious, and unreasonable in its business decision making; evaded the spirit of the bargain, lacked diligence, and defeated Plaintiffs' justifiable expectations; slacked off, willfully rendered imperfect performance, and abused its power to specify terms; acted with improper motives, including but not limited to, unfairly favoring its company owned restaurants; and interfered with or failed to cooperate with Plaintiffs' performance.

**ANSWER:** Defendants deny the allegations contained in Paragraph 149 of the Complaint.

150.    Pie Five's breaches have been material.

**ANSWER:** Defendants deny the allegations contained in Paragraph 150 of the Complaint.

151.    As the direct and foreseeable consequences of Pie Five's breaches Plaintiffs have suffered substantial damages in amounts that will be proven at trial, including actual damages, consequential damages and lost profits.

**ANSWER:** Defendants deny the allegations contained in Paragraph 151 of the Complaint.

## **ALLEGATIONS NOT SPECIFICALLY ADMITTED**

Defendants deny all allegations of the Complaint, including the prayer for relief, except as explicitly admitted above.

54

## DEFENDANTS' AFFIRMATIVE DEFENSES

### First Affirmative Defense

Plaintiffs' claims are barred by the doctrines of waiver and estoppel, including, but not limited to, estoppel based upon the provisions contained in Paragraphs 26 and 30 of the applicable Franchise Agreements.

### Second Affirmative Defense

Plaintiffs have failed to mitigate their damages.

### Third Affirmative Defense

Plaintiffs' claims have been released pursuant to written releases in the Franchise Agreements, including the releases contained in Paragraph 17 of the Franchise Agreements.

### Fourth Affirmative Defense

Plaintiffs' claims are barred by Plaintiffs' own material breaches of contract and misconduct, including, but not limited to, their failure to properly operate the franchised restaurants, as documented in operational reviews, their failure to contribute to the development of the brand and failure to perform their contractual obligations in good faith, and their unauthorized closure of the Schaumberg and Rolling Meadows restaurants, as set forth in the Counterclaim.

### Fifth Affirmative Defense

Plaintiffs' claims for punitive, exemplary, multiple, or consequential damages, or any damages other than actual damages, are barred by Paragraph 24 of the Franchise Agreements and Paragraph 19.5 of the Area Development Agreements.

### Sixth Affirmative Defense

Plaintiffs' demand for a jury trial is contrary to the express agreement in Paragraph 28.4

of the Franchise Agreements and Paragraph 19.4 of the Area Development Agreements and should be stricken

## Seventh Affirmative Defense

Any claim for punitive damages would violate the due process and excessive fines clauses of the U.S. Constitution.

WHEREFORE, Defendants deny that Defendants are entitled to any of the relief requested in the Complaint, and respectfully request that the Court dismiss Plaintiffs' Complaint in its entirety, with prejudice, enter judgment in favor of Defendants and against Plaintiffs, and award such other and further relief to Defendants as the Court may deem just and proper.

## DEFENDANT'S COUNTERCLAIMS

Pursuant to Rule 13 of the Federal Rules of Civil Procedure, Defendant/Counterclaimant Pie Five Pizza Company, Inc. alleges in support of its counterclaims as follows:

## PARTIES

1.      Defendant/Counter-Claimant Pie Five Pizza Company, Inc. ("Pie Five") is a corporation organized under the laws of Texas, with its principal place of business at 3551 Plano Parkway, The Colony, Texas 75056.  Pie Five is the franchisor of a fast casual restaurant chain that specializes in handcrafted personal pizzas provided to the customer within five minutes of ordering.  Pie Five is also the assignee of certain claims of its corporate affiliate, Pie Five Restaurants, Inc. ("Pie Five Restaurants").

2.      Plaintiff/Counter-Defendant B & C Resources, Inc. ("B & C Resources") is a corporation organized under the laws of Illinois, with its principal place of business at 3041 N. Lincoln Avenue, Suite 1R, Chicago, Illinois 60657.

3. Plaintiff/Counter-Defendant MBT-FIVE, Inc. ("MBT-Five") is a corporation organized under the laws of Indiana, with its principal place of business at 3041 N. Lincoln Avenue, Suite 1R, Chicago, Illinois 60657.

4. Plaintiff/Counter-Defendant Carl A. Dissette ("Dissette") is an individual who is a resident of Michigan. Dissette is the President of B & C Resources and MBT-Five and personally guaranteed their obligations to Pie Five.

<u>JURISDICTION AND VENUE</u>

5. The Court has subject matter jurisdiction over Pie Five's counterclaims pursuant to 28 U.S.C. § 1367.

6. The Court has personal jurisdiction over Counterclaim-Defendants Dissette, B & C Resources and MBT- Five based on, *inter alia*, their transaction of business in the state of Illinois.

7. Venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to Pie Five's claims occurred in this District.

<u>BACKGROUND</u>

<u>Schaumburg and Rolling Meadows Franchises</u>

8. In late 2014, Dissette approached Pie Five and expressed interest in entering the Chicago market as a Pie Five franchisee.

9. On April 4, 2016, one of Dissette's wholly-owned corporations, B & C Resources, entered into an Asset Purchase Agreement with Pie Five Restaurants through which it acquired certain rights to operate an existing Pie Five restaurant located at 1428 North Meacham Road, Schaumburg, Illinois 60173 ("Schaumburg") and certain rights to operate a new Pie Five

restaurant to be located at 1219 West Golf Road, Rolling Meadows, IL 60008 ("Rolling

Meadows").  As part of the April 4, 2016 Asset Purchase Agreement:

    a.  Pie Five Restaurants assigned a Commercial Lease dated November 20, 2014

        between Pie Five Restaurants and Landlord, NARE Meacham Square LLC, for

        the Schaumburg property to B & C Resources.  As a result of the assignment, B &

        C Resources became responsible from April 4, 2016 forward for all of Pie Five

        Restaurants' obligations, covenants, and duties under the Commercial Lease,

        including, but not limited to, the obligation to pay monthly rent to NARE

        Meacham Square, LLC in the amount of $6,533.33 per month.

    b.  B & C Resources, Inc. also executed an April 4, 2016 Franchise Agreement ("the

        Schaumburg Franchise Agreement") authorizing it to operate a Pie Five franchise

        at the Schaumburg location.  Dissette personally guaranteed B & C Resources'

        obligations under the Schaumberg Franchise Agreement.

    c.  Pie Five Restaurants assigned a November 17, 2015 Shopping Center Lease

        between Pie Five and Landlord, Meadows Crossing, LLC, to B & C Resources.

        As a result of the assignment, B & C Resources became responsible from April 4,

        2016 forward for all of Pie Five Restaurants' obligations, covenants and duties

        under the Shopping Center Lease, including, but not limited to, the obligation to

        pay monthly rent to Meadows Crossing in the amount of approximately $4,245

        per month.

    d.  B & C Resources executed an April 4, 2016 Franchise Agreement ("the Rolling

        Meadow Franchise Agreement") authorizing it to operate a Pie Five franchise at

the Rolling Meadow location. Dissette personally guaranteed B & C Resources' obligations under the Rolling Meadows Franchise Agreement.

  e.   Dissette personally guaranteed all of B & C Resources' obligations under the relevant agreements with Pie Five Restaurants in a Guarantee and Assumption of Obligation dated April 4, 2016.

10.    Under Sections 1.1.1 and 2.1 of the respective Franchise Agreements, B & C Resources was required to operate the restaurants during the entire term of the Agreement. *See* Franchise Agreement § 1.1.1 ("Subject to the terms and conditions of this Agreement, we hereby grant to you the right, and you undertake the obligation, to use the Proprietary Marks and the System to continuously operate the Franchised Restaurant at the Franchised Location during the term of this Agreement ("Term")."); *id.* § 2.1 ("The Term begins on the Effective Date and expires at midnight on the day preceding the 10th anniversary of the date the Franchised Restaurant first opened for business, unless this Agreement is terminated at an earlier date as provided in Section 19."). Under the terms of the Franchise Agreements for each restaurant, B & C Resources was obligated to pay a Royalty Fee equal to six percent (6%) of Gross Sales and a Brand Fund contribution of two percent (2%) of Gross Sales at the restaurant, with such amounts payable weekly.

**Breaches of the Schaumburg and Rolling Meadows Agreements**

11.    On December 30, 2016, less than nine months after taking assignment of the Rolling Meadows lease and entering into the Franchise Agreement, Dissette unilaterally notified Pie Five that he was closing the Rolling Meadows restaurant, effective the next day. Dissette then did, in fact, close the restaurant immediately thereafter. Pie Five did not consent to this premature closure.

12.　　On March 8, 2017, Dissette notified Pie Five via email of his intent to unilaterally close the Schaumburg restaurant. Pie Five did not consent to Dissette closing this location.

13.　　Notwithstanding his notification, Dissette continued to operate the Schaumburg location after March 8, 2017. However, on information and belief, he and his company did not pay the required rent to the Landlord, NARE Meacham Square LLC.

14.　　On or around April 3, 2017, Pie Five Restaurants received a "Landlord's Five Days' Notice" letter from counsel for NARE Meacham Square LLC demanding that Pie Five remit $25,194.81 in unpaid rent for the Schaumburg property within five days of service of the letter.

15.　　On or around April 24, 2017, Pie Five Restaurants received a second letter from counsel for NARE Meacham Square LLC as a "final attempt" to collect the amount of unpaid rent. The letter also informed Pie Five Restaurants that its right to possession of the premises, which had been assigned to B & C Resources, had been terminated.

16.　　On or around May 12, 2017, NARE Meacham Square LLC served Pie Five Restaurants with a Complaint/Eviction Summons in the Cook County Circuit Court First Municipal District (Case # 2017M1707140). The lawsuit sought to recover from Pie Five Restaurants (and/or B & C Resources) possession of the Schaumburg property at 1428 N. Meacham Road and $25,194.81 in allegedly unpaid rent, plus costs and any additional unpaid rent due and owing going forward at the rate of $6,533.33 per month.

17.　　On May 16, 2017, Pie Five sent a notice of default to Dissette under Section 19.1.10 of the Schaumburg Franchise Agreement in connection with his failure to comply with his obligations under the Franchise Agreement and the Lease Assignment Agreement.

18.     On May 22, 2017, Dissette advised Pie Five via email that "we have made the final decision to close Schaumburg Illinois Pie Five Pizza, effective today May 22." The restaurant did, thereafter, close. Pie Five did not consent to Dissette closing this location.

19.     Neither B & C Resources nor Dissette has paid the outstanding balance of unpaid rent to the Landlord, NARE Meacham Square LLC, and the Landlord has taken the position that Pie Five Restaurants is liable to NARE Meacham Square LLC for all such amounts.

### Castleton Crossing Franchise

20.     On or about September 18, 2014, another of Dissette's wholly-owned companies, MBT-Five, entered into an Area Development Agreement with Pie Five. Pursuant to the terms of the Area Development Agreement, MBT Five was required to develop (and had exclusive rights to develop) Pie Five restaurants within a designated territory and within a specified time. Pursuant to the terms of the Area Development Agreement, however, each new restaurant was required to be the subject of a separate franchise agreement that would govern the operations of the restaurant. *See, e.g.*, § 1.2 ("**Development Rights Only**. This Agreement is not a license or franchise agreement. It does not give you the right to operate Pie Five Restaurants or use the System or the Proprietary Marks, nor does it give you any right to license others to operate Pie Five Restaurants. This Agreement only give you the opportunity to enter into Franchise Agreements for the operation of Franchise Restaurants at Authorized Sites. Each Franchised Restaurant developed pursuant to this Agreement must be established and operated only in strict accordance with a separate Franchise Agreement."), § 5.5 ("**Execution of Franchise Agreements**. If we accept the site for a Franchised Restaurant, we will prepare and forward to you a Franchise Agreement for the Authorized Site. The form of Franchise Agreement will be the then-current standard form in general use at the time of our notice to you. Within 15 days

after you receive the Franchise Agreement, you must sign the Franchise Agreement and return it to us along with the Initial Franchise Fee. We will countersign the Franchise Agreement when we authorize the opening of the Franchised Restaurant.")

21.     On or about November 3, 2016, MBT Five opened a Pie Five restaurant at 5320 E. 82nd Street, #C, Indianapolis, IN 46204 ("Castleton Crossing").

22.     Despite the express obligations in the Area Development Agreement and Pie Five's repeated requests, MBT Five has not signed the proffered franchise agreement with Pie Five authorizing its operation of the Castleton Crossing restaurant:

    a.  On November 1, 2016, Pie Five sent Dissette a copy of the franchise agreement for the Castleton Crossing location. Dissette acknowledged receipt on November 10, 2016, but did not return an executed copy.

    b.  Pie Five sent another copy of the franchise agreement to Dissette on December 20, 2016, but Dissette again refused to return an executed copy.

23.     MBT Five has also failed and refused to pay Pie Five the $20,000 initial franchise fee that is required to be paid before a franchisee is permitted to operate a Pie Five restaurant. Pie Five did not waive collection of this fee.

<u>COUNT I: BREACH OF CONTRACT</u>
<u>VIOLATION OF SCHAUMBURG FRANCHISE AGREEMENT</u>

24.     Pie Five incorporates by reference Paragraphs 1 - 23 of this Counterclaim as if set forth fully herein.

25.     B & C Resources entered into a valid and enforceable Franchise Agreement with Pie Five to operate the Schaumburg restaurant. Dissette personally guaranteed B & C Resources' obligations under the Franchise Agreement.

26.     Pie Five performed its obligations under the Schaumburg Franchise Agreement.

27.     B & C Resources has breached Sections 1.1.1 and 2.1 of the Schaumburg Franchise Agreement by ceasing operation at the Schaumburg location prior to the expiration of the Franchise Agreement and without Pie Five's consent.

28.     B & C Resources' breaches of the Schaumburg Franchise Agreement are material. These breaches have deprived Pie Five of the benefit of its bargain, namely that the restaurant would remain in operation for the full term of the Franchise Agreement and continue to pay applicable royalties and Brand Fund contributions throughout the term of the Agreement.

29.     As a direct and foreseeable consequence of B & C Resources' breaches, Pie Five has suffered and will continue to suffer substantial damages, including but not limited to unpaid royalties and Brand Fund contributions, in an amount to be proven at trial.  Dissette has personally guaranteed and is liable for these obligations.

### COUNT II: BREACH OF CONTRACT
### VIOLATION OF SCHAUMBURG LEASE

30.     Pie Five incorporates by reference Paragraphs 1 - 29 of this Counterclaim as if set forth fully herein.

31.     Pie Five Restaurants validly assigned its obligations, covenants, and duties under the Schaumburg Commercial Lease to B & C Resources on April 4, 2016 pursuant to the Lease Assignment Agreement.  From that point forward, B & C Resources was required to pay monthly rent in the amount of $6,533.33 to the Landlord, NARE Meacham Square LLC. Dissette personally guaranteed B & C Resources' obligations under the relevant agreements.

32.     B & C Resources has breached Section 4 of the Lease Assignment Agreement and the Lease by failing to pay monthly rent to NARE Meacham Square LLC.  *See* Lease Assignment Agreement § 4 ("As of the Effective Date, Assignee undertakes and agrees to fulfill, observe, perform and discharge all of Assignor's obligations, covenants and duties under the

63

Lease that accrue on and after the date hereof.") as well as by abandoning the restaurant.  The Landlord is seeking to recover from Pie Five Restaurants amounts of rent allegedly due and owing to NARE Meacham Square LLC that B & C Resources has failed to pay.

33.     B & C Resources' breaches of the Schaumburg Lease Assignment Agreement and Lease are material.  These breaches have deprived Pie Five Restaurants of the benefit of its bargain, namely that all amounts due to Landlord under the Lease would be paid by B & C Resources and/or Dissette.

34.     As a direct and foreseeable consequence of B & C Resources' breaches, Pie Five Restaurants has suffered and will continue to suffer substantial damages, including any and all amounts paid or payable to the Landlord.  In addition, B & C Resources' actions in failing to pay monthly rent have directly caused Pie Five Restaurants to be subject to a lawsuit in the Cook County Circuit Court First Municipal District that seeks recovery of the Schaumburg property and $25,194.81 in unpaid rent, plus costs and any additional unpaid rent due and owing going forward at the rate of $6,533.33 per month.  Dissette has personally guaranteed and is liable for these obligations.  Pie Five Restaurants has assigned these claims to Pie Five.

**COUNT III: BREACH OF CONTRACT**
**VIOLATION OF ROLLING MEADOWS FRANCHISE AGREEMENT**

35.     Pie Five incorporates by reference Paragraphs 1 - 34 of the Counterclaim as if set forth fully herein.

36.     B & C Resources entered into a valid and enforceable Franchise Agreement with Pie Five to operate the Rolling Meadows restaurant.  Dissette personally guaranteed B & C Resources' obligations under the relevant agreement.

37.     Pie Five performed its obligations under the Rolling Meadows Franchise Agreement.

64

38.     B & C Resources has breached Sections 1.1.1 and 2.1 of the Rolling Meadows Franchise Agreement by ceasing operation at the Rolling Meadows location prior to the expiration of the Franchise Agreement and without Pie Five's consent.

39.     B & C Resources' breaches of the Rolling Meadows Franchise Agreement are material.  These breaches have deprived Pie Five of the benefit of its bargain, namely that the restaurant would remain in operation for the full term of the Franchise Agreement and continue to pay applicable royalties and Brand Fund Contributions throughout the term of the Agreement.

40.     As a direct and foreseeable consequence of B & C Resources' breaches, Pie Five has suffered and will continue to suffer substantial damages, including but not limited to unpaid royalties and Brand Fund contributions, in an amount to be proven at trial.  Dissette has personally guaranteed and is liable for these obligations.

## COUNT IV: BREACH OF CONTRACT/DECLARATORY RELIEF
## VIOLATION OF ROLLING MEADOWS LEASE ASSIGNMENT

41.     Pie Five incorporates by reference Paragraphs 1-40 of this Counterclaim as if set forth fully herein.

42.     Pie Five Restaurants validly assigned its obligations, covenants, and duties under the Rolling Meadows Commercial Lease to B & C Resources on April 4, 2016 pursuant to the Lease Assignment Agreement.  From that point forward, B & C Resources was required to pay monthly rent in the amount of approximately $4,225 to the Landlord, Meadows Crossing, LLC. Dissette personally guaranteed B & C Resources' obligations under the relevant agreements.

43.     B & C Resources has breached Section 3 of the Lease Assignment Agreement and Lease by failing to pay monthly rent to Meadows Crossing, LLC.  *See* Lease Assignment Agreement § 3 ("As of the Effective Date, Assignee undertakes and agrees to fulfill, observe, perform and discharge all of Assignor's obligations, covenants and duties under the Lease that

65

accrue on and after the date hereof.") as well as by abandoning the restaurant.  Notwithstanding the assignment, the Landlord may look to Pie Five Restaurant with respect to any delinquency, and Dissette and B & C Resources have not acknowledged their responsibility for resolving this potential liability.  As such, there is an actual and justiciable controversy between the parties.

44.     B & C Resources' breaches of the Rolling Meadows Lease Assignment Agreement and Lease are material.  These breaches have deprived Pie Five of the benefit of its bargain, namely that all amounts due to the Landlord would be paid by B & C Resources and/or Dissette.

45.     Pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, Pie Five seeks a judicial declaration that any claims asserted by the Rolling Meadows Landlord are the responsibility of B & C Resources and Dissette (pursuant to his guarantee), not Pie Five, and that Dissette and B & C Resources must compensate Pie Five for any amounts paid by them or any expenses incurred by them.  To the extent that any amounts are actually paid by or on behalf of Pie Five prior to trial, Pie Five will also be entitled to damages in that amount.

### COUNT V:  DAMAGES AND DECLARATORY RELIEF (CASTLETON)

46.     Pie Five incorporates by reference Paragraphs 1 – 45 of this Counterclaim as if set forth fully herein.

47.     MBT-Five and Dissette have been operating a Pie Five franchise in Castleton Crossing since November 3, 2016 without having signed the required Franchise Agreement and without tendering the $20,000 initial franchise fee owed to Pie Five.  Dissette has failed and refused to execute the agreement on behalf of MBT-Five, and also has failed and refused to execute the associated guarantee.

48.     Pie Five has been damaged in the amount of $20,000 as a consequence of the refusal to pay the required initial franchise fee for the Castleton restaurant.  In addition, pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, Pie Five seeks a judicial declaration that MBT Five and Dissette are required to either execute the Castleton Crossing Franchise Agreement (including the guarantee) or cease operations at the Castleton Crossing restaurant immediately.

49.     An actual and substantial controversy exists because MBT Five and Dissette are continuing to operate a Pie Five restaurant at Castleton but have refused to obtain the required written authorization from Pie Five.

## PRAYER FOR RELIEF

WHEREFORE, Pie Five prays for judgment against Plaintiff/Counterclaim-Defendants Carl A. Dissette, B & C Resources, Inc., and MBT Five, Inc. as follows:

1.     Damages according to proof for breach of the Schaumburg Franchise Agreement, Lease Assignment Agreement, and Lease;

2.     Damages according to proof for breach of the Rolling Meadows Franchise Agreement, Lease Assignment Agreement, and Lease, as well as a declaratory judgment that B & C Resources and Dissette are responsible for any and all amounts owed to the Rolling Meadows landlord;

3.     Damages in the amount of $20,000 for the failure to pay the initial franchise fee for the Castleton franchise;

4.     Declaratory judgment that MBT-Five and Dissette are required to either execute the Castleton Crossing Franchise Agreement (including the personal guarantee) or cease operations at the Castleton Crossing restaurant immediately;

5.      Pre-judgment interest at the highest rate allowable by law;

6.      Costs of suit;

7.      Reasonable attorneys' fees in accordance with the terms of the pertinent

agreements; and

8.      All such other and further relief as the Court deems just and proper.

Respectfully submitted,

By:  /s/ Michael L. Sturm
Michael L. Sturm (admitted *pro hac vice*)
Wiley Rein LLP
1776 K Street, NW
Washington, DC  20006
(202) 719-7000
msturm@wileyrein.com

Norman T. Finkel
Schoenberg, Finkel, Newman &
Rosenberg, LLC
222 South Riverside Plaza, Suite 2100
Chicago, IL  60606
(312) 648-2300
Norm.Finkel@sfnr.com

May 25, 2017                              *Counsel for Defendants Pie Five Pizza Company,*
                                         *Inc. and Rave Restaurant Group, Inc.*