UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| CARL A. DISSETTE, B & C RESOURCES, INC., MBT FIVE, INC., and MBT-FIVE IOWA, INC., <br><br> Plaintiffs, <br><br> vs. <br><br> PIE FIVE PIZZA COMPANY, INC., RANDALL E. GIER, MARK H. RAMAGE, and RAVE RESTAURANT GROUP, INC., <br><br> Defendants. | Case No. 1:16-cv-11389 <br><br> Hon. Thomas M. Durkin |
| PIE FIVE PIZZA COMPANY, INC., <br><br> Counter-Plaintiff, <br><br> vs. <br><br> B & C RESOURCES, INC., MBT-FIVE, INC., and CARL A. DISSETTE, <br><br> Counter-Defendants. | |

**PLAINTIFFS' AMENDED RULE 65 MOTION FOR TEMPORARY
RESTRAINING ORDER AND PRELIMINARY INJUNCTIVE RELIEF[1]**

Under Federal Rule of Civil Procedure 65, Plaintiffs Carl Dissette and two of

his companies, MBT FIVE, INC. (operator of four Pie Five's in Indiana) and MBT-

---

[1] Dissette supports this motion with his Declaration (marked Ex. A) and the exhibits thereto. This motion was filed without the exhibits to Mr. Dissette's declaration and is refiled to include those exhibits (and correct a couple of formatting errors). There are no changes to the text of the motion or the declaration.

1

FIVE IOWA, INC. (operator of one Pie Five in Iowa) – collectively "Dissette" on this motion – move for a TRO and preliminary injunctive relief:

1. Enjoining Defendant Pie Five from causing Performance Food Group ("PFG") to stop delivery by Dissette without approval by the Court.

2. Enjoining Pie Five from enforcing a claimed (*but non-existent*) contractual requirement forcing Dissette to allow NORCO, a division of RAVE (Pie Five's corporate parent) to collect from Dissette his payments to PFG for the products he needs to operate his units.

3. Enjoining Defendant Pie Five from making unauthorized early ACH withdrawals from Dissette's bank accounts before the scheduled draw date.

4. Enjoining Pie Five from enforcing a contractual requirement that Dissette make his purchase of his needed supplies only through PFG, freeing Dissette to buy from more reliable and more competitive suppliers.

### Protecting the Status Quo

This requested injunctive relief is necessary to protect (to the extent possible) the *status quo* that existed at the start of this lawsuit. *See Ross v. Hardy*, 2013 U.S. Dist. LEXIS 33621, at *7-8 (N.D. Ill. Mar. 12, 2013):

> "To prevail on a motion for a preliminary injunction, the moving party must demonstrate (1) a likelihood of success on the merits; (2) a lack of an adequate remedy at law; and (3) an irreparable harm will result if the injunction is not granted." *Woods v. Buss*, 496 F.3d 620, 622 (7th Cir. 2007), quoting *Foodcomm Int'l v. Barry*, 328 F.3d 300, 303 (7th Cir. 2003). If the moving party meets these requirements, a court must then

balance the relative harms that could be caused to either party. *Woods*, 496 F.3d at 622, citing *Incredible Tech., Inc. v. Virtual Tech., Inc.*, 400 F.3d 1007, 1011 (7th Cir. 2005). A preliminary injunction is an "extraordinary remedy" intended to minimize the hardship to the parties and to preserve the *status quo* pending a more considered decision of the merits when possible. *Indiana Civil Liberties Union v. O'Bannon*, 259 F.3d 766, 770 (7th Cir. 2001).

At the start of this lawsuit, the *status quo* was that Dissette operated seven Pie Five's, but he is now down to five as he was forced to close his two in Illinois (in Rolling Meadows and Schaumburg). (*see* Ex. A, Dissette's Declaration at ¶13). Pie Five was also operating several company-owned units in Illinois, but the world of Pie Five is crumbling. Pie Five has now closed all of its own Illinois units and has closed additional Pie Five restaurants in Minnesota.[2] Relatedly Pie Five's parent is credibly reported to be in financial distress:

> Pie Five parent company Rave Restaurant Group, which also owns Pizza Inn, has had a bumpy past year. It lost $7.9 million on $14.8 million in revenue in its most-recent quarter. Its stock trades at $2.07 per share, down from a 52-week high of $5.57 last April and almost $15 in early 2015.[3]

Dissette remains the owner of five more Pie Fives in Indiana and Iowa, where the future is uncertain. (Ex. A, at ¶13). This Rule 65 motion is necessary to protect the *status quo* of allowing Dissette to keep as many units open as possible through trial (which as part of this motion Plaintiffs seek to expedite).[4] If Dissette fails in this

---

[2] See http://www.nrn.com/operations/pie-five-closes-9-restaurants-amid-lawsuit.

[3] See: http://www.chicagobusiness.com/article/20170322/BLOGS09/170329958/pie-five-pizza-abruptly-closes-eight-chicago-area-restaurants

[4] As stated in the conclusion of this motion, Dissette proposes expediting discovery and consolidating the evidentiary hearing on the motion for preliminary injunction with a bench trial on all claims and counterclaims. To that end, Plaintiffs waive their jury demand (thus mooting defendants' continuing objection to jury trial).

3

endeavor he and/or his operating companies will likely be forced into bankruptcy as he will face lease liability and loan defaults, and over 200 employees will lose their jobs. (*Id.* at ¶21). This harm would be irreparable. See, *Stuller, Inc. v. Steak N Shake Enters.*, 2011 U.S. Dist. LEXIS 66455, at *29 (C.D. Ill. June 21, 2011) ("The loss or threatened loss of a franchise can constitute irreparable harm"); citing *Semmes Motors, Inc. v. Ford Motor Co.*, 429 F.2d 1197, 1205 (2d Cir. 1970) (temporarily enjoining the defendant from terminating 20-year old dealership, finding the loss of the dealership was not entirely measurable in monetary terms); *see also Roland Machinery Co. v. Dresser Industries, Inc.*, 749 F.2d 380, 387 (7th Cir. 1984) (recognizing that a damages remedy is inadequate if it "may come too late to save the . . . business [of the party seeking the prelimiary injunction]."); *Beilowitz v. General Motors Corp.*, 233 F.Supp.2d 631 (D.N.J. 2002).

The *status quo* is endangered by the facts discussed below in ¶¶A-M. The conduct of these Defendants threaten Dissette with the unacceptable choice of enduring a slow (but accellerating) business death if he continues to acquiesce in Pie Five's and Rave's unlawful practices *pendente lite* -- or a quick, sudden business death if he tries to achieve positive change without the Court's intervervention (as almost occurred this week, leading plaintiffs to file this motion):

A. The root of the problem is that Pie Five requires Dissette to make almost all food supply purchases (everything except Coke®) from PFG, an unreliable and overpriced supplier whose sole qualification to be the designated supplier to the Pie Five system is its willingness to handsomely remunerate Pie Five for this privilege.

4

(Ex. A ¶¶2, 8 - 11).[5] PFG cannot (or will not) deliver timely and adequate goods or services, and its prices are not competitive. *Id.* These problems are not exaggerated. The harm to any franchisee trying to run a restaurant busines with unreliable and overpriced supply cannot be overstated.

      B.      Pie Five makes everything worse by requring Dissette to allow NORCO, a division of Rave (Pie Five's corporate parent) to collect from Dissette his payments to PFG for the products he needs to operate his units instead of allowing Dissette to pay PFG directly. This practice, which is not authorized by any contract, exposes Dissette to multiple injuries and potential injuries including (i) delayed delivery to Dissette when Norco delays paying PFG (*See* ¶C below), (ii) the risk of, and damaged caused by erroneous early withdrawals from Dissette's business operating accounts (*See* ¶D below), and (iii) the risk of being exposed to double-payment if for any reason Norco, after taking Dissette's money, fails to pay PFG, and PFG demands payment from Dissette. Given Rave's apparently dire financial circumstances, stated above, this last risk is not speculative. Pie Five imposes this requirement, injuring Dissette even though:

      a. PFG itself approved Dissette to establish a direct customer relationship with PFG. (Ex. A ¶23). Despite establishing a direct

---

[5] The extent of this remuneration is under investigation in discovery. Separately, the fact that neither Pie Five or Norco make any sales to Dissette renders unlawful all remuneration Pie Five has received from PFG based on Dissette's purchases. Section 12.6.3. of the franchise agreements is the only provision referencing Pie Five's potential role as a distributor/supplier. It states: "*we and our affiliates may earn income on direct sales of products, ingredients and/or supplies to you.*" As no direct sales are made by Pie Five or Norco to Dissette, the remuneration they receive from PFG is in breach of contract. This issue will be part of Dissette's damages case.

    customer relationship with Dissette at each location, PFG allows Pie Five and Rave (through its Norco division) to interfere in that relationship by interposing the requirement on Dissette he pay PFG through ACH drafts by Norco.

b. Pie Five and Rave insist that Dissette agreed to this arrangement in his franchise agreements, but Dissette disagrees and has alleged the franchise agreements do not authorize Pie Five to require Dissette to pay PFG through Norco. (Complaint, ¶¶ 54-57).

c. Specifically, Item 6 of the FDDs and Section 6.5 of the franchise agreements give Pie Five the power to make ACH direct withdrawls from Dissette's bank accounts for any payments owed to Pie Five and its affiliates -- "you must participate in our electronic funds transfer program … you must make all payments *to our affiliates* including Norco through our electronic funds transfer program." (*See* FDD at Item 6; *see also* Franchise Agreement at Section 6.5 (emphasis supplied)). Referring to this contract language there are three critical facts:

    i. **PFG is not (nor was it disclosed as) an affiliate of Pie Five.** This means that payments to PFG are not covered by an ACH agreement that Dissette ever signed or agreed to.

    ii. **Norco does not take title of the products Dissette buys (i.e. must buy) from PFG and therefore Norco is not the**

                  **seller of anything to Dissette. (Exhibit B, PFG Distrbution Agreement, Sec. 2).** There is nothing in any contract Dissette ever signed allowing Pie Five to demand that Dissette route his payments to a designated third-party supplier through Norco.

          iii.    As already stated, PFG established direct customer relationships with Pie Five franchisees including Dissette. (Ex. A ¶23). Consistent with this direct customer relationship, PFG invoices Dissette directly. (Ex. A, ¶26). Only then does Rave (Norco) interfere by demanding Dissette pay PFG through an ACH draft to Norco.

    C.    Adding to Dissette's injury, PFG has placed deliveries to Dissette "on credit hold" over thirty times. (Ex. A ¶6). This can only result from late payment by RAVE (Norco) to Pie Five. **To repeat, Dissette has been placed on credit hold over 30 times even though Dissette was never late in paying.** Each time the delay was by NORCO as apparently RAVE uses this money as its own piggybank and pays PFG when it can. Being repeatedly placed on credit hold through no fault of his own has resulted in significant injury to Dissette. (Ex. A ¶¶7 - 10). Each and every occassion in which Dissette was placed on credit hold was a breach by PFG and would excuse Dissette's further performance of any *alleged* contract obligation on his part to allow Norco to collect his payments to PFG by ACH draft under the well-known doctrine of prevention – but as no such contract obligation exists in the first place, it

should not be neccessary for Dissette to establish grounds for invoking the doctrine of prevention.[6]

    D.  Related to these credit holds, Dissette has been suffering, Pie Five continues to require Dissette to pay PFG through Pie Five on a "Net 7" base, while Pie Five pays PFG on a "Net 14" (or longer) base[7], allowing Pie Five to earn interest on the float but putting Dissette at risk if Pie Five fails to pay PFG on his behalf. (*see* Ex. A ¶5; *see also* Ex. 1, current PFG invoice). **This float income is yet another source of revenue to Pie Five based on Dissette's purchases that Pie Five failed to disclose in its FDDs -- yet another disclosure violation committed by this Defendant.**

    E.  Making everything even worse, in recent weeks (most recently June 14, 2017), Pie Five made *unauthorized* early ACH withdrawals from Dissette's

---

[6] "In contract law, the general principle known as the doctrine of prevention provides that, 'if one party to a contract hinders, prevents, or makes impossible performance by the other party, the latter's failure to perform will be excused." *Tabatabai v. West Coast Life Ins. Co.,* 664 F.3d 663, 666 (7th Cir.2011) (quoting Richard A. Lord, Williston on Contracts § 39:3 (4th Ed. 2000) ("[T]he nonoccurrence or nonperformance of a condition is excused where that failure of the condition is caused by the party against whom the condition operates to impose a duty."); see also *Cummings v. Beaton & Assocs., Inc.,* 618 N.E.2d 292, 303, 249 Ill.App.3d 287, 187 Ill. Dec. 701 (1992) (The doctrine operates as an estoppel, "prohibit[ing] a party from profiting through his own wrongdoing."); *Lopez v. Pactiv Corp.*, 2013 WL 4008626 (N.D. Ill. 2013); *Cenco Inc. v. Seidman & Seidman*, 686 F.2d 449, 453 (7th Cir. 1982) ("A breach of contract is excused if the promisee's hindrance or failure to cooperate prevented the promisor from performing the contract.") The "prevention of performance" doctrine states that where a promisor prevents, hinders, or renders impossible the occurrence of a condition precedent to his or her promise to perform, the promisor is not relieved of the obligation to perform and may not invoke the other party's performance as a defense when sued upon the contract. Samuel Williston, *A Treatise on the Law of Contracts* § 39:1 (Richard A. Lord ed.,4th ed. 2000).

[7] As Dissette attests to the best of his knowledge, Pie Five used to pay PFG on Net 30 or 40 bases.

bank accounts before the scheduled draw date, which threatens to cause Dissette to bounce other checks written on his business operating accounts. (Ex. A, ¶¶14-15). This conduct is a breach of the agreement between the parties, and another example of Pie Five's conduct hindering and harming Dissette's ability to maintain his franchises – and arguably it constitutes the tort of conversion.[8] Dissette has demanded that Pie Five stop this practice. (Ex. A, ¶¶14-15). While Pie Five admitted its error, Dissette has received no assurance of compliance moving forward. *Id.*

    F. After Pie Five's unauthorized early withdrawal on June 14, 2017, Dissette demanded the opportunity to purchase directly from PFG and informed Pie Five he would cancel the ACH authorization. On June 20, 2017, Pie Five – the party that has engaged in the reckless and unreasonable practices stated above – responded by instructing PFG to immediately stop delivery to Dissette's units, threatening Dissette with the need to close his business doors by the end of this week if he cannot adequately cover. Pie Five stated to Dissette: "PFG is not authorized to bill/collect independently to franchisees within the Pie Five system", and that, "we will be stopping all further deliveries effective immediately to limit our credit risk and

---

[8] Conversion requires: (1) the defendant's unauthorized and wrongful assumption of control, dominion, or ownership over the plaintiff's personal property; (2) the plaintiff's right in the property; (3) the plaintiff's right to immediate possession of the property, absolutely and unconditionally; and (4) the plaintiff's demand for possession of the property. *Bill Marek's the Competitive Edge, Inc. v. Mickelson Group, Inc.*, 806 N.E.2d 280, 285 (Ill. App. Ct. 2004). Withdrawing funds from someone's bank account a day early, without permission is the "unauthorized and wrongful assumption of control, dominion, or ownership over the plaintiff's personal property" within the meaning of this language.

forward along a formal notice of default." (*See* Ex. A, ¶¶15 -16). PFG stopped *all* deliveries to Dissette per Pie Five's instruction. (*Id.* at ¶¶16 -17).

G. **Pie Five and PFG stopped delivery even though Dissette is not in default of any payment obligations for the products he has purchased.** (Ex. A, ¶¶17 - 18 and emails cited therein).

H. Pie Five ordered PFG to stop delivery knowing this would cause Dissette to shut down his operations. In no uncertain terms, Pie Five has presented Dissette with the choice of dying a slow business death or a fast one.

I. The emergency on June 21, 2017 (Pie Five ordering PFG to stop delivery), was temporarily resolved by an exchange of emails between the attorneys for Dissette, Pie Five and PFG on the afternoon of June 21, 2017.[9] The emergency on

---

[9] Wed 6/21/2017 2:45 PM – Caruso (for Dissette) to Counsel for Pie Five and PFG:

> We demand Pie Five immediately inform PFG to resume shipment of product to all of Dissette's Pie Five units and we demand that PFG comply.
>
> Dissette will allow Pie Five to continue the ACH drafting of his accounts unless/until Judge Durkin puts a stop to this practice. However we demand a stop to the early withdrawals that have occurred recently and put Dissette at unnecessary risk of bouncing checks.
>
> We understand the shipments needed for Dissette to remain open the rest of the week were withheld even though Dissette was not in breach.
>
> Please confirm supply to the Dissette units will be immediately resumed and whether the cancelled shipments will be reinstated. Absent this assurance Dissette will attempt to cover the missing shipments so the units can stay open. The added costs will be claimed as damages.
>
> We reserve all rights and remedies.

Wed 6/21/2017 3:42 PM --Michael Sturm for Pie Five to Caruso with "cc" to PFG's counsel:

10

June 21 was averted, but the underlying crisis threatening to destroy Dissette's business before this case reaches trial remains.

   J. For all the reasons above, Dissette will likely succeed on the merits in his challenges to Defendant's ACH practices and designation of PFG as the sole supplier to protect its own remuneration.

   K. The harm and burden to Pie Five in excusing Dissette from the ACH payment scheme is minimal and is outweighed by the continuing injury to Dissette. If Dissette continues to buy from PFG, PFG may continue to remunerate Pie Five. The ACH scheme is unnecessary to protect Pie Five's revenue stream prior to trial.

   L. Any income loss suffered by Pie Five if the Court were, at this stage, to allow Dissette to buy from better suppliers would be significantly less than the continuing injury to Dissette; and that Pie Five's contractual claim to this income is so weak must factor into this balancing of harms in favor of Dissette.

---

> Based upon your specific representation below that Dissette now agrees to allow ACH withdrawals from his accounts, Pie Five has directed PFG to resume deliveries to the Dissette restaurants, effective immediately. I will not respond to your various factual assertions, other than to note that it is our understanding that Dissette had received everything he had actually paid for.
>
> It is unfortunate that your client's precipitous actions caused the recent unnecessary disruptions, and he is solely responsible for any and all "damages" that may have resulted.
>
> Pie Five reserves all rights and remedies and expects that your client in the future will comply with the obligations in the franchise agreements.

Wed 6/21/2017 3:58 PM --Attorney for PFG to Caruso and counsel for Pie Five:

> To close the loop, I understand from my client that it has received authorization to resume deliveries and will be doing so as soon as possible.

11

M. It is increasing clear Dissette will have no adequate remedy at law if he is knocked out of business and forced into bankruptcy before trial; and in terms of public interest, closing his five remaining units would require Dissette to discharge approximately 200 employees and also harm his landlords. Nothing will be gained by allowing Defendants to push Dissette over the edge into bankruptcy.

## REQUESTS FOR RELIEF

WHEREFORE, Dissette seeks the following Rule 65 relief:

1. **Enjoining Defendant Pie Five from causing PFG to stop delivery to Dissette without approval by the Court.**

2. **Enjoining Pie Five from enforcing a claimed (*but non-existent*) contractual requirement forcing Dissette to allow NORCO, a division of RAVE (Pie Five's corporate parent), to collect his payments to PFG for the products he needs to operate his units.**

3. **Enjoining Pie Five from making unauthorized early ACH withdrawals from Dissette's bank accounts before the scheduled draw date.**

4. **Enjoining Pie Five from enforcing a harmful contractual requirement that Dissette purchase all his needed supplies only through PFG.**

## CLARIFICATION OF THE RECORD AND ADDITONAL RELIEF REQUESTED

(A) Plaintiffs waive their jury demand, thus mooting defendants' objection to trial by jury.

12

(B)     Plaintiffs request a TRO on the first, second and third requests for relief stated above.

(C)     Plaintiffs propose expedited discovery and consolidation of this Rule 65 Motion with an early bench trial. Federal Rule of Civil Procedure 65(a)(2) allows for this Court to consolidate a preliminary injunction hearing with a bench trial on the merits. Consolidation is appropriate when the resulting record would be sufficiently complete to warrant a judgement on the merits. *Crumble v. Blumthal*, 549 F.2d 462, 466 (7th Cir. 1977). Plaintiffs note that, before consolidating, the court should give parties "clear and unambiguous notice to that effect either before hearing commences or at time which will still afford parties full opportunity to present their respective cases." *Pughsley v. 3750 Lake Shore Drive Coop. Bldg.*, 463 F.2d 1055, 1057 (7th Cir. 1972). The Seventh Circuit has encouraged district courts to utilize "the time saving consolidation procedure outlined in rule 65(a)(2)," which "should be employed whenever feasible." *Foster Park v. Volpe*, 466 F.2d 991, 993 (7th Cir. 1972) (*per curiam*); see *Jordan v. Wolke*, 593 F.2d 772, 775 (7th Cir. 1978). The Rule expressly allows a court to order consolidation "before or after beginning the hearing on a motion for a preliminary injunction . . . ." Fed. R. Civ. P. 65(a)(2). A plaintiff that is successful on the merits may then be granted a permanent injunction, as opposed to a preliminary one. See *Am. Train Dispatchers Dep't of Int'l Broth. of Locomotive Eng'rs v. Fort Smith R.R. Co.,* 121 F.3d 267, 271 (7th Cir. 1997) (affirming the district court's grant of a permanent injunction after consolidation under Rule 65(a)(2)).

DATED: June 22, 2017

        Respectfully submitted,

        CARL DISSETTE, B&C
        RESOURCES, INC. MBT FIVE, INC.
        and MBT-FIVE IOWA, INC.

        By: /s/ Carmen D. Caruso

Carmen D. Caruso cdc@cdcaruso.com
Jackie C. Condella Jcc@cdcaruso.com
Xia Cao xcao@cdcaruso.com
CARMEN D. CARUSO LAW FIRM
77 West Washington Street, Suite 1900
Chicago, Illinois 60602
(T) (312) 626-1160
(F) (312) 276-8646

CERTIFICATE OF SERVICE

      I certify that on June 22, 2017 I caused a copy of the foregoing Plaintiffs' Rule 65 Motion to be filed with the Clerk of Court using the ECF system which sends notice of filing to all counsel of record; and with hand-delivery to the Court in Chambers.


                                                /s/ Xiaoyin Cao